**John M. FARREN, Plaintiff,**

**v.**

**GENERAL MOTORS CORPORATION and Giffin, Inc., Defendants and Third–Party Plaintiffs,**

**v.**

**GIFFIN, INC. and Automatic Systems, Inc., Third–Party Defendants and Fourth–Party Plaintiffs,**

**v.**

**PRIME STEEL ERECTING, INC., Fourth–Party Defendant.**

Civ. A. No. 86–1444–N.

United States District Court, D. Massachusetts.

March 7, 1989.

Paul Goodale, Raynham, Mass., for Farren.

John D. Curran, Boston, Mass., for Giffin and GMC.

David M. Rogers, for GMC.

Robert A. Curley, Boston, Mass., for Automatic Systems, Inc.

Robert L. Farrell and Paul Saltzman, Boston, Mass., for Prime Steel Erecting, Inc.

## ORDER

March 7, 1989

DAVID S. NELSON, District Judge.

The Magistrate's *Report* and *Recommendation* are hereby adopted and *ordered;* therebeing no opposition thereto.

## REPORT AND RECOMMENDATION RE: THIRD–PARTY DEFENDANT AUTOMATIC SYSTEMS, · INC.'S MOTION FOR SUMMARY JUDGMENT

February 15, 1989

PATTI B. SARIS, United States Magistrate.

Plaintiff John M. Farren, a Massachusetts resident, filed this action for injuries suffered when he fell through an opening in a catwalk at the General Motors Corporation ("General Motors") assembly plant in Framingham, Massachusetts on November 24, 1984. The original complaint was filed in Suffolk Superior Court and alleged a cause of action for negligence against General Motors. General Motors is a Delaware corporation with a principal place of business in Detroit, Michigan.

On General Motors' petition, the action was removed to this Court on the ground of diversity of citizenship. General Motors then filed a third-party complaint against two independent contractors hired by it to do construction work at the Framingham assembly plant—Automatic Systems, Inc. ("ASI"), a Missouri corporation, and Giffin, Inc. ("Giffin"), a Michigan corporation. The third-party complaint originally alleged claims for contractual indemnity and for contribution against Giffin in Counts I and II. These counts were later dismissed on General Motors' motion because Giffin agreed to indemnify General Motors. (*See* Docket 93). Count III still remains and alleges a claim for contractual indemnity against ASI.

Giffin filed a fourth-party complaint, asserting claims for contribution, common law indemnity and contractual indemnity against Prime Steel Erecting, Inc. ("Prime Steel"), one of its subcontractors that allegedly was responsible for performing work on the catwalk plaintiff claims he fell through. ASI also filed crossclaims against Giffin and Prime Steel alleging that in the event it is found to be an indemnitor of General Motors, it is entitled to obtain contractual and common law indemnity from Giffin and Prime Steel, as well as contribution as subrogor of General Motors.

On June 14, 1988, this Court allowed plaintiff's motion to file an amended complaint to add Giffin as a direct defendant in the action. (Docket 93, pgs. 1–2).[1]

Referred here for report and recommendation is ASI's motion for summary judgment. Plaintiff and defendant General Mo-

---

1. In the same order, the Court denied plaintiff's motion to add Prime Steel, a Massachusetts corporation, as a direct defendant and to remand the action to the state court. (*Id.,* pgs. 2–9).

tors have opposed certain aspects of the motion. The Court RECOMMENDS that the motion be DENIED except in the following respect. ASI has requested partial summary judgment to the extent that since Giffin has admitted its obligation to indemnify General Motors, "the most that ASI can ever be liable to GM for indemnity would be fifty percent of GM's *pro rata* share of the entire liability, if any, to the Plaintiff." (Docket 84S, Brief, pgs. 15–16). Plaintiff's request has already been allowed by the Court as a condition for dismissal of General Motors' contractual indemnity count against Giffin. (Docket 93, pg. 10). Therefore, the Court recommends that in this one respect, the motion be allowed.

### FACTUAL BACKGROUND [2]

*Undisputed Facts*

Farren is a millwright. (Docket 84S, Ex. A, pg. 9). In November 1984, he was hired by a division of ASI, known as MECO, Inc., to do work at the General Motors assembly plant in Framingham, Massachusetts. (*Id.*, pgs. 49, 52; Docket 36–C, ¶ 3). At that time, renovations were being made at the plant, and for this purpose, General Motors had hired, among others, Giffin and ASI as principal contractors for the work. ASI was hired to do "the conveying work, installing conveyor components and conveyor parts." (Docket 84S, Ex. D, pg. 75). Giffin was responsible for "structural steel oven housing and heater house installation," as well as other areas of work. (*Id.*). Giffin's responsibilities included the construction of an oven extension and the tying in of existing catwalks with new catwalks in the area where the extension was to be built. (*Id.*, Ex. E, pg. 34).

Both ASI and Giffin, as the Contractors, entered into separate written agreements with General Motors, as the Owner. (*See id.*, Ex. K–L). The Contract General Conditions between ASI and General Motors provided in relevant part in paragraph 30 as follows:

Except as otherwise provided in Paragraph 40 hereof entitled "Fire and Supplemental Insurance," the Contractor assumes all risks of damages or injuries, including death, to any property or persons used or employed on or in connection with the work, and all risks of damages or injuries, including death, to any property or persons wherever located, resulting from any action, omission or operation under the Contract or in connection with the work.

The Contractor shall indemnify, hold harmless and defend the Owner, its employes (sic), agents, servants and representatives from and against any and all losses, damages, expenses, claims, suits and demands of whatever nature, resulting from damages or injuries, including death, to any property or persons, *caused by or arising out of any action, omission or operation under the Contract or in connection with the work attributable to the Contractor,* any Subcontractor, any Material Supplier, any of their respective employes, agents, servants and representatives, or any other person, including the Owner, its employes, agents, servants and representatives; *provided, however, that the Contractor shall not be required to indemnify the Owner, its employes, agents, servants and representatives hereunder for any damages or injuries, including death, to any property or persons, caused solely and exclusively by the negligence of the Owner, its employes, agents, servants and representatives.*

(*Id.*, Ex. L, ¶ 30) (emphasis added). The Construction General Conditions between Giffin and General Motors contained the same provision, with only a few minor differences in language. (*Id.*, Ex. K, ¶ 20).

Certain terms and conditions also accompanied General Motors' order to ASI for the purchase of "all labor, material, equipment engineering design and servi[c]es necessary for the complete installation of the ... conveyors." Paragraph 14 of these terms and conditions provided: "If this or-

---

**2.** The facts are derived from the pleadings and the various exhibits submitted by the parties with respect to the pending motion for summary judgment.

der covers the performance of labor for Buyer, Seller agrees to indemnify and protect Buyer against all liability, claims or demands for injuries or damages to any person or property growing out of the performance of this order, by Seller, its servants, employes (sic), agents or representatives."

Farren began work at the General Motors plant as an employee of the ASI division three or four days prior to November 24, 1984. (*Id.*, Ex. A, pg. 49). He had worked at the plant one other time in 1981 for a period of approximately five months. (*Id.*, pgs. 49–50).

Farren worked the second shift from 5:00 p.m. to 3:00 a.m., and was given a 45–minute lunch break in the middle of his shift. (*Id.*, pgs. 52–53). On the night of November 24, 1984, he began his "lunch break" by spending 15 to 20 minutes downstairs eating in the break room near where he was working. (*Id.*, pgs. 55–56). After that, he went upstairs with a fellow worker, Bill Keating, to visit crew members who were doing work upstairs. (*Id.*, pgs. 56–57). They used an escalator to get to the upstairs break area and did not go out on the catwalks. (*Id.*, pgs. 66–67).

After Farren finished talking with his co-workers, he started back to his work area with Keating. (*Id.*, pgs. 68, 83). His lunch period had ended by that time, and so he decided to take a shortcut to get back to the work area as quickly as possible. (*Id.*, pgs. 68–69). The shortcut he decided to take was a route he thought he had taken before when he worked at the plant in 1981. (*Id.*, pg. 71). He said: "I thought that when I went from one side of the plant to the other via the catwalk, being outside, I'd only have to go down a stairwell and walk a short distance and I'd be in the work area, where I started off that night." (*Id.*, pg. 73).

The decision to use the catwalk was Farren's own decision. (*Id.*, pg. 165). Farren did not ask anyone whether it was "okay" for him to walk out on the catwalk. (*Id.*). He had not been informed by anyone that he should not be on the catwalks unless authorized; nor had he been informed by his employer that he should remain in his work area at all times. (Docket 90, Ex. E, pg. 80). Farren had received safety instructions from his union to always be aware of his surroundings and knew, without being told, that when he was on any given job he was either supposed to be doing specifically assigned work in the area where the work was going on or in the areas where breaks were permitted. (Docket 84S, Ex. A, pgs. 104–05, 118).

Farren opened a door, which was unlocked, to get to the catwalk. (Docket 90, Ex. E, pg. 79). He did not remember seeing any signs on the door or having to step over anything to get on the catwalk. (*Id.*, pgs. 79–80). He was the first one to walk out onto the catwalk, which was located on the roof in the area designated as Column M–22. (Docket 84S, Ex. A, pg. 83; Docket 90, Ex. F, General Introduction). Farren came from a lighted area inside to a dark area outside. (Docket 84S, Ex. A, pg. 84). As he was walking along the catwalk, he could see some spots in front of him but not other spots. (*Id.*, pg. 86). After walking on the catwalk for no more than a minute or two, Farren fell through an opening in the catwalk onto the roof below. (*Id.*; *see also* Ex. B, pg. 18). Farren said: "When I got to the hole, I didn't know it was a hole, I was just walking.... It was just walking off a table into darkness." (*Id.*, Ex. A, pg. 92).

Hardy Jackson, a security officer at General Motors who was on duty at the time of the accident, responded to the accident when he heard Keating "yelling hysterically." (*Id.*, Ex. B, pgs. 4, 12–13). He stated that at the point where Farren was on the roof, the lighting was minimal, "only coming from the lower exit doors." (*Id.*, pg. 43). John Cooper, another security officer at General Motors who was on duty at the time of the accident and reported to the scene, observed "complete darkness." (*Id.*, Ex. C, pg. 33). According to Richard Thomson, senior project engineer at General Motors, there were two metal halide light fixtures in the area of the catwalk Farren allegedly fell through in November 1984. (*Id.*, Ex. D, pg. 53–54). There was a

control mechanism on these lights which would automatically turn the lights on when it became dark outside. (*Id.*, pgs. 54–55).

The night of the accident, Jackson checked the area of the catwalk which plaintiff allegedly fell through and found a large section of the catwalk cut away "approximately a foot or two on either side of M–22." (*Id.*, Ex. B, pgs. 48–49). He measured the hole which was approximately 46″ long and 35″ wide. (*Id.*, pg. 49). Photographs of the hole in the catwalk showed that a hand railing and a portion of a steel beam called a "toe plate" were cut away. (*Id.*, Ex. E, pg. 112).

The demolition of the catwalks in the area where the accident allegedly occurred was the responsibility of Giffin under its contract with General Motors. (*Id.*, Ex. D, pg. 41). Giffin in turn had hired Prime Steel as a subcontractor to perform the structural steel work of removing existing catwalks and adding new catwalks. (*Id.*, Ex. E, pg. 37; Ex. F, pg. 47). General Motors had provided Giffin with a list of recommended local contractors to choose from to do the subcontract work. (*Id.*, Ex. E, pg. 17).

Arnold Heilman, Operations Manager of Giffin, testified in his deposition that a toe plate was installed under Giffin's contract with General Motors along the side of the catwalk in the area designated as M–22, which was where the catwalk Farren used was located. (*Id.*, pg. 123). He said the removal of the toe plate was Giffin's responsibility and that Giffin had hired Prime Steel to perform the work, as well as the removal of a hand railing. (*Id.*, pg. 115). Edward L. Long, General Manager of Prime Steel, recalled in his deposition that Prime Steel did install a new catwalk, which abutted the existing catwalk, in the area between M–20 and M–22. (*Id.*, Ex. F, pgs. 58, 2–31). He further recalled that in order to add the new catwalk, "we would have removed the handrail, and ... a toe plate or kick plate" of the existing catwalk "along this stretch between M–20 and M–

22." (*Id.*, pgs. 58–59, 2–52). Edward A. Long, who was Prime Steel's general foreman responsible for overseeing the construction work performed at the General Motors assembly plant in Framingham in 1984, corroborated this testimony in his deposition. (*Id.*, Ex. G, pgs. 10, 39, 2–29, 2–89). He also stated that work performed by Prime Steel outside the plant on the roof was done during the shifts from 7:00 a.m. to 4:30 p.m. (Docket 105, Ex. O, pgs. 24–25). There is no evidence in the record of the date(s) when the hole was created in the catwalk used by Farren.

*Disputed Facts*

There are factual disputes between ASI, Farren and General Motors as to whether ASI and General Motors bore any responsibility for, or had any connection with, Farren's accident.

ASI states that neither it nor General Motors were responsible for the accident and that there is no evidence in the record that they knew of the hole in the catwalk or the absence of lighting on the catwalk at the time of the accident.[3] ASI relies on the evidence showing that the hole was created by Prime Steel, and deposition testimony of Heilman and Edward L. Long that Giffin and Prime Steel had the responsibility to oversee safety and correct unsafe conditions on their job sites. (*Id.*, Ex. E, pgs. 45–47; Ex. F, pg. 96). Edward L. Long stated that according to standard practice in the construction industry if an opening had been made by Prime Steel, it was Prime Steel's responsibility to provide a barricade around it. (*Id.*, Ex. F, pgs. 2–60, 2–61). Heilman also said that if an opening in a walkway were created by Giffin or Giffin's people, "[i]t was our responsibility to make sure that it was barricaded." (*Id.*, Ex. E, pg. 74). In its answer to plaintiff's interrogatory 18, General Motors stated that Giffin, as the contractor performing work in the area where the accident occurred, was responsible "for maintaining the catwalk in a hazard-free condition consistent with their construction requirements." (*Id.*, Ex. J).

---

**3.** General Motors has joined in this argument only to the extent ASI claims General Motors

was not responsible for or connected with plaintiff's injuries. (*See* Docket 103, pg. 2).

In addition, with respect to its own involvement in the matter, ASI relies on its answers to interrogatories stating that it did not engage any person, firm, or entity to perform work on or adjacent to the catwalk in issue, and that its agents, servants or employees did not observe the condition of the catwalk during the day prior to the accident and were not informed of its condition. (*Id.*, Ex. H, Interrogatory 9; Ex. I, Interrogatories 15–16). ASI further stated that "[t]he accident in issue happened in an area for which neither Automatic Systems, Inc. nor MECO, Inc. had any responsibility when the Plaintiff, on a frolic of his own, allegedly fell through an opening in a catwalk." (*Id.*, Ex. I, Interrogatories 5–6).

With respect to General Motors' involvement, ASI cites the deposition testimony of John Cooper, who stated that in the course of his investigation of the incident he never learned of any reports that General Motors had received concerning the existence of the hole before November 24, 1984; and the deposition testimony of Richard Thomson, who stated that General Motors did not do its own inspections of the work as it progressed and that inspections were instead done on a daily basis by an employee of a company hired by General Motors as a consultant to coordinate job site activity. (*Id.*, Ex. C, pg. 81; Ex. D, pgs. 133–34). ASI also points to the deposition testimony of Richard Thomson concerning the alleged failure of the lights. Thomson stated that General Motors made no arrangements to alter the operation of the control of the light fixtures while construction was ongoing in 1984; that the light fixtures were attached to a wall which was removed by Giffin as part of the process of constructing the oven extension; that if walls were to be demolished, the live electricity inside the walls would have had to been turned off; and that the use of electricity by contractors in the area of the lights resulted in overloads on more than one occasion causing the circuit breaker to trip. (*Id.*, Ex. D, pgs. 55, 58–59, 163–64).

ASI cites other evidence to show that General Motors could not have foreseen Farren's accident. Specifically, Hardy Jackson testified in his deposition that there were signs posted on the doors leading to the catwalks saying "employees keep off the roof"; that the catwalks were only used for the purpose of reaching the ovens in the event of an oven breakdown; and that the catwalk used by Farren did not lead to any area where construction operations were going on on the night of November 24, 1984. (*Id.*, Ex. B, pgs. 79–80, 84–85). Richard Thomson also testified in his deposition that construction workers who were not working in the area of the catwalks were not authorized to be on the catwalks and that the only instance of which he was aware of a person falling through a hole in a catwalk was the incident involving Farren. (*Id.*, Ex. D, pgs. 14–15, 110–11).

To dispute ASI's assertion that it was not responsible for or connected with Farren's accident, General Motors has cited the indemnity provisions contained in paragraph 30 of the Contract General Conditions between General Motors and ASI and in paragraph 14 of the terms and conditions accompanying General Motors' purchase order to ASI. (*See* Docket 104, # 1–2).

General Motors also relies on Richard Thomson's deposition testimony that ASI was informed on or about November 7, 1984 that its workers should not be allowed to walk around the plant (Docket 104, Ex. 2, pgs. 123–26); and on the fact that Farren was not informed prior to his accident that he was to remain in his work area while at the plant (Docket 90, Ex. E, pg. 80).

Farren also has cited evidence in the record to dispute ASI's claim that General Motors was not responsible for Farren's accident. Specifically, Farren points to the evidence indicating that General Motors' permanent lighting in the roof area was not functioning at the time of the accident (Docket 90, Ex. D, pg. 43; Ex. C, pgs. 33–35); that General Motors itself roped off areas under construction which it considered to be dangerous or hazardous (Ex. B, pg. 144); that Richard Thomson, who served as a project engineer at General Motors in November 1984, went out onto the roof during the construction period ap-

proximately three times a week to observe construction activities (Ex. A, pg. 81); and that General Motors had the right to point out any safety violations observed by its "safety people" to the appropriate contractor for correction and to remove any contractor from the job site that did not take care of a safety problem (Ex. B, pgs. 48–49).

Farren points out that General Motors was fully aware that certain catwalks on the roof would be dismantled as part of the roof renovations. Indeed, Farren highlights Giffin's contract with General Motors which specified that the "written approval of the Owner must be obtained prior to drilling of holes in structural steel, or cutting of openings of any size in walls, ceilings, roofs, floors, etc., in connection with any repair work." (Docket 84S, Ex. K, ¶ 33). Farren also argues that the risk that an employee would fall through an open and unguarded hole in a catwalk was foreseeable based on evidence that in the summer months before November 1984 employees had been found on more than one occasion by General Motors' personnel up on the catwalks smoking cigarettes and drinking alcoholic beverages. (Docket 90, Ex. D, pgs. 87, 101).

In addition, Farren points to evidence that General Motors was in control of the access doors to the catwalks and allowed them to remain unlocked while the extensive renovations were going on on the rooftop. (*Id.*, Ex. A, pgs. 166–67). He also disputes that there was any sign on the door leading to the catwalk used by him which warned of the defective condition of the catwalk. Farren relies on photographs of two catwalk doors at the plant with the sign on one door only saying "To Roof," and the sign on the other door only saying "Authorized Personnel Only." (*Id.*, Ex. G).

Finally, Farren states that there is evidence showing that General Motors retained an active role in site safety procedures. He cites Heilman's deposition testimony that the responsibility for detecting safety violations on the site was the "shared responsibility" of General Motors, the contractors and subcontractors. (*Id.*,

Ex. B, pg. 49). He also points out that the contract between General Motors and Giffin specified that the contractor was to work in close cooperation with General Motors personnel regarding safety and that all plant safety rules applied to the contractor. (*Id.*, Ex. I, pg. 6).

## DISCUSSION

The standard for summary judgment is clear. ASI is entitled to summary judgment only if a review of the entire record demonstrates there are no material factual issues in dispute. *See Stepanischen v. Merchants Dispatch Transportation Corp.*, 722 F.2d 922, 930 (1st Cir.1983). In deciding the motion for summary judgment, the court must look at the record in the light most favorable to, and indulge all inferences in favor of, the parties opposing the motion, here Farren and General Motors. *See Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The purpose on summary judgment is to go behind the pleadings and determine whether any further exploration of the facts is really necessary. *Johnson v. Educational Testing Service*, 754 F.2d 20, 25 (1st Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985). The parties opposing the motion may not rest on assertions made in their pleadings, but rather must come forward with specific facts demonstrating a genuine and material issue for trial. Fed.R.Civ.P. 56(e).

ASI argues that it is entitled to summary judgment on two grounds. First, it argues that General Motors has no need of indemnity from ASI because plaintiff has produced no evidence to show that General Motors breached any duty to plaintiff or that General Motors' conduct was a proximate cause of plaintiff's injuries. Second, ASI argues that the indemnity contract between General Motors and ASI does not require ASI to indemnify General Motors under the circumstances of this case. The Court will address each argument separately below.

## A. Negligence Claim Against General Motors

Although the choice-of-law issue has not been briefed, the parties have addressed the claim against General Motors under Massachusetts law. The Court agrees that Massachusetts law should govern the resolution of this claim since General Motors' allegedly negligent conduct occurred in Massachusetts. *Cf. Schulhof v. Northeast Cellulose, Inc.,* 545 F.Supp. 1200, 1204–05 (D.Mass.1982) (Massachusetts was the jurisdiction with the strongest interest in resolving the tort issues since it was where the accident and the alleged negligence took place).

### 1. *Breach of Duty of Care*

ASI first claims that it is entitled to summary judgment because there is no evidence in the record that General Motors breached any duty of care to Farren. In order to maintain his negligence action against General Motors, Farren must establish that General Motors owed some obligation or duty towards him which it left undischarged or unfulfilled. *See Mounsey v. Ellard,* 363 Mass. 693, 297 N.E.2d 43, 45 (1973). The existence of a duty is typically a question of law, not fact. *Carrier v. Riddell, Inc.,* 721 F.2d 867, 868 (1st Cir. 1983).

Under Massachusetts law, a property owner who hires an independent contractor to work on his land cannot be held *vicariously* liable for injuries suffered on the job by the contractor's employees, even when the work performed under the contract is deemed to be "inherently dangerous." *Vertentes v. Barletta Co.,* 392 Mass. 165, 466 N.E.2d 500, 502 (1984). However, this rule is inapplicable where plaintiff seeks to impose *direct* liability on the owner/employer of the independent contractor for its own negligence. *Id.,* 466 N.E.2d at 503; *see also Hood v. Hess Oil Virgin Islands Corp.,* 650 F.Supp. 678, 679 (D.V.I. 1986) (and cases cited therein).

Various theories of direct liability have been invoked in cases such as this involving landowner-employers of independent contractors.

### a. Landowner's Duty of Care.

One theory that has been invoked is based on the duty of the employer as landowner to exercise care to all lawful visitors on its premises, which is well-established in Massachusetts. *See Jenkins v. Uniroyal, Inc.,* 668 F.Supp. 56, 60 (D.Mass.1987) (in action for injuries to a worker arising out of an accident which occurred on Uniroyal's premises, where work was being performed by various contractors and subcontractors and it was unclear who was responsible for the violation of safety regulations, summary judgment in favor of Uniroyal was denied on the ground that it would be held liable under its duty as landowner if it could not be established at trial which contractor or subcontractor was responsible).

The Massachusetts Supreme Judicial Court has held that the duty of care owed by the property owner to an employee of an independent contractor is the same as that owed all other lawful visitors on the premises, and that "an employee of an independent contractor should not be made to suffer the negligence of the property owner." *Poirier v. Town of Plymouth,* 374 Mass. 206, 372 N.E.2d 212, 227 (1978) (*"Poirier"*). The duty of the landowner includes an obligation to maintain the premises in a reasonably safe condition and to warn of dangers of which it was aware or reasonably should have been aware. *Polak v. Whitney,* 21 Mass.App. 349, 487 N.E.2d 213, 215 (1985).

The property owner cannot be held liable for negligence where there is no evidence that it knew or should have known of the existence of a dangerous condition on its premises at the time of the accident. *Briggs v. Taylor,* 397 Mass. 1010, 494 N.E. 2d 1023, 1025 (1986) (affirming directed verdict for the property owner).

Moreover, if a risk is of such a nature that it would be obvious to persons of average intelligence, there is, ordinarily, no duty on the part of the property owner to warn of the risk. *Polak v. Whitney,* 21 Mass.App. 349, 487 N.E.2d at 216; *see also Young v. Atlantic Richfield Co.,* 400 Mass. 837, 512 N.E.2d 272, 276 (1987) (hold-

ing that the owner of a gasoline service station was under no duty to post a sign warning its patrons to be aware of other automobiles in the area), *cert. denied,* — U.S. ——, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988).

In *Poirier,* the Supreme Judicial Court overruled an earlier case which held that only where there is a "hidden defect" does a duty of care exist to an employee of an independent contractor, see *Afienko v. Harvard Club of Boston,* 365 Mass. 320, 312 N.E.2d 196 (1974). In overruling *Afienko,* the *Poirier* Court explained in dicta that:

> The ordinary risks of service are those that are not created by negligence or breach of duty on the part of the employer. *Such risks include those that are inherent in the job and of which the employee is fully aware....* "Extraordinary" risks, on the other hand, are those that are created by the employer's negligence.

> We recognize that there are instances of hazardous employment where an independent contractor is engaged to do a particular task which presents inherent risk to the employees of that contractor. To some extent the hidden defect doctrine was developed to reflect an allocation of risk as between the employer (property owner) and the employee (independent contractor's employee) who accepts such employment. We do not here seek to preclude the continuation of such a proper allocation of risk between the parties nor to make the property owner an insurer against all loss.

372 N.E.2d at 227 (citations omitted) (emphasis added).

Courts in other jurisdictions have also addressed the extent of the landowner's duty to employees of independent contractors and have held that the duty does *not* extend to situations where the defective conditions were created by the work of the independent contractor and his employees.

*See, e.g., Hood v. Hess Oil Virgin Islands Corp.,* 650 F.Supp. at 682 (granting the owner/employer's motion for summary judgment as to claim asserting its liability as a landowner where the dangerous condition resulting in the employee's injury was created by the work of the independent contractor and its employees and there was no evidence to contradict the independent contractor's control of the project); *Moore v. Noble Drilling Co.,* 637 F.Supp. 97, 100 (E.D.Tex.1986) (under Texas law, "where a dangerous condition is transitory and arises out of the performance of the work, the owner/employer of the independent contractor generally is not under a duty to see that it is done safely"); *Holdaway v. Gustanson,* 546 F.Supp. 231, 233 (D.Wyo. 1982) (owner/employer was "not obligated to protect the employees of [independent contractor] from hazards which are incidental or part of the very work which [the independent contractor] was hired to perform").[4]

In *Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030, 1034–36 (3d Cir. 1987) ("*Williams* "), the Third Circuit held that where the evidence raises questions of fact as to whether the property owner relinquished possession of the premises where the accident occurred, and as to the safety of the conditions of such premises, it is for the jury to resolve the issue of liability under the theory dealing with the landowner's duty, which is set forth in *Restatement (Second) of Torts* § 343 (1965). The court distinguished cases where employees were injured while working on structures which were built by the independent contractor and where it was evident that the independent contractor's work had necessarily displaced the owner's possession. It also rejected the owner's argument that it had no duty to protect plaintiff from conditions at the work site because it contractually delegated that responsibility to the independent contractor, stating:

> tractor's operations so that it could not shield itself from liability. *Holdaway v. Amoco Production Co.,* 751 F.2d 1129, 1130–31 (10th Cir. 1984). *See* pgs. 445–46, *infra.*

---

**4.** The Tenth Circuit reversed the district court's allowance of the owner/employer's motion for summary judgment in *Holdaway* on the ground that a factual issue was raised as to whether the owner retained sufficient control over the con-

We are unwilling to hold that as a matter of law a contract between an owner and independent contractor allocating responsibility between themselves for maintaining a safe premises may relieve the owner of liability to invitees for injuries sustained as a result of dangerous conditions known or discoverable by the owner. Instead, the contract was a factor along with others to be considered by the jury in assessing liability for the allegedly dangerous condition of the workplace access turned over by [the owner].

*Id.* at 1035–36. *Cf. Hafferman v. Westinghouse Electric Corp.*, 653 F.Supp. 423, 430 (D.D.C.1986) (owner's duty to properly maintain an elevator is nondelegable).

ASI argues that as a matter of law General Motors cannot be held liable because Farren has produced no evidence that General Motors was responsible for the creation of the allegedly dangerous conditions complained of by plaintiff or that General Motors knew or should have known of such conditions at the time of the accident. (Docket 84S, Brief, pg. 6). The Court disagrees. Farren has produced evidence that General Motors' written approval was required *prior* to the drilling of holes or cutting of openings in connection with any repair work and that Richard Thomson of General Motors would inspect construction activities on the roof area of the plant approximately three times a week during the construction period. This evidence creates an issue of fact as to whether General Motors was aware of the hole in the catwalk at the time of the accident.

Moreover, although the evidence indicates that the hole was created by Prime Steel under its subcontract with Giffin, evidence was produced that General Motors shared the responsibility of ensuring site safety, including roping off dangerous areas; that General Motors had responsibility for the access doors leading to the catwalks; and that the permanent lighting fixtures in the roof area of the plant were installed and automatically operated by General Motors. Evidence was also submitted by Farren that on the night of his accident there was no barricade surrounding the opening in the catwalk; the door to the catwalk used by him was unlocked and did not contain a sign warning of the defective condition of the catwalk; and the permanent lighting fixtures in the roof area of the plant were not working. Such evidence further creates issues of fact as to whether General Motors retained any responsibility for maintaining safe premises in the area of the catwalk, as to whether General Motors failed to take adequate safety precautions with respect to the catwalk, and as to whether any such failure on the part of General Motors was unreasonable in the circumstances and contributed to plaintiff's injuries.[5]

In sum, here, as in *Williams*, there are questions of material fact raised by the admissible evidence cited by Farren which preclude the Court from ruling as a matter of law that General Motors cannot be held liable under its duty as a landowner.

#### b. Employer's Duty of Care.

■ Even assuming that General Motors cannot be held liable for the breach of any duty of care owed by it as a landowner, if it is found to have retained the control of any part of the work entrusted to an independent contractor, it is subject to liability for physical harm to others for whose safety it owes a duty to exercise reasonable care, which is caused by its failure to exercise its control with reasonable care. *See Restatement (Second) of Torts* § 414 (1965). Comment c to § 414 provides:

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its

---

**5.** ASI argues that the Court should rule as a matter of law that the lack of lighting was not due to any unreasonable conduct by General Motors and that the failure to lock the door to the catwalk did not constitute negligence. However, these are issues for the jury to decide in light of the totality of the circumstances. *See Swift v. United States*, 866 F.2d 507, 510–11 (1st Cir.1989).

progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.... There must be such a retention of a right of supervision that the contractor is not entirely free to do work his own way.

Courts construing this provision have held that liability can only be imposed on owners retaining control over actual conduct of the work, and that a general right of inspection to ensure compliance with project specifications or the right to conduct safety inspections or prescribe safety requirements is insufficient to impose liability under § 414. *See, e.g., Hood v. Hess Oil Virgin Islands Corp.*, 650 F.Supp. at 681 (granting summary judgment for owner/employer of independent contractor). *See also Buxton v. Amoco Oil Co.*, 676 F.Supp. 722, 726–28 (W.D.La.1987) (same).

If the only evidence Farren produced were that General Motors had the right to point out safety violations and to remove any contractor that did not take care of a safety problem, General Motors would be entitled to summary judgment on the issue of its liability under § 414. However, here, Farren has produced additional evidence that General Motors retained an active role in site safety, including roping off areas considered to be hazardous, which raises a genuine issue of fact as to whether it retained sufficient control to establish liability in this case. *See Hood v. Hess Oil Virgin Islands Corp.*, 650 F.Supp. at 680–81 (stating that "control is a factual issue to be resolved by the jury" and that if the owner/employer assumed affirmative duties with regard to safety, it retained sufficient control to be held liable if it exercises that control negligently).

In addition, evidence was submitted that General Motors retained control over the access doors leading to the catwalks as well as the permanent lighting fixtures. Since Farren argues that the absence of lighting from the permanent fixtures in the roof area and the failure to lock or post warning signs on the access door contributed to his accident, this evidence creates a genuine issue of material fact which also precludes summary judgment on the issue of General Motors' liability under § 414.

### 2. *Proximate Cause*

■ Citing *O'Shaughnessy v. Besse*, 7 Mass.App. 727, 389 N.E.2d 1049 (1979) *("O'Shaughnessy")*, ASI also claims that as a matter of law General Motors cannot be held liable for Farren's injuries because "the evidence clearly establishes that, as between GM and the Plaintiff, the sole proximate cause of the Plaintiff's injury was the decision of John Farren to walk out into the darkness on what he knew was an unlighted catwalk in an area which he knew or should have known was under construction and which was not an area where either he or other members of his crew were working." (Docket 84S, Brief, pg. 10).

*O'Shaughnessy* is distinguishable from the case at hand.

*O'Shaughnessy* involved a marine accident where a motor boat going 5 m.p.h. over the speed limit collided with a float in the mooring area of a harbor. 389 N.E.2d at 1051. Plaintiff was a passenger in the boat and brought suit against the harbor master and the harbor patrolman for the injuries he suffered as a result of the accident, alleging among other things that they negligently failed to place lights on the float. *Id.* at 1051–52. In that case, looking to admiralty law, the court affirmed the trial judge's order of entry of judgment for defendants notwithstanding the verdict on this claim because "the proximate cause of the collision was the manner in which [the boat was] navigated." *Id.* at 1053. The court reasoned that had the boat been operated "within the statutory speed limits, it is, at the least, less likely that the collision would have occurred or, had it occurred, that it would have resulted in physical injuries." *Id.* at 1054. The court further pointed out that the operator of the boat did not respond with "any evasive action ... when he saw the float twenty-five to thirty yards in front of him." *Id.*

Here, in contrast, there is no evidence in the record that Farren saw the hole in the catwalk or knew about the hole or had any warnings that the catwalk was under dem-

olition before he fell through it so as to take evasive action. Indeed, Farren stated that he did not know that he had reached a hole when he was on the catwalk and that it was like "walking off a table into darkness." Moreover, although there is ample evidence in the record to support the argument of comparative negligence on the part of Farren, such evidence is insufficient to establish as a matter of law that the sole proximate cause of Farren's accident was his own negligence.

ASI further argues that General Motors' allegedly negligent conduct was not the proximate cause of plaintiff's injuries because the injuries were not a foreseeable consequence of General Motors' acts. The First Circuit has recently stated that under well-settled Massachusetts law, "[a]pplication of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the fact finder." *Swift v. United States*, 866 F.2d 507, 510 (1st Cir.1989) (holding that the district court erred in ruling *as a matter of law* that the serving of liquor to a person who did not appear intoxicated was not the proximate cause of the tragedy that eventually ensued). In any case where there might be reasonable difference of opinion as to whether defendant's conduct has been a substantial factor in causing the harm to plaintiff, the question is one for the jury. *Springer v. Seamen*, 821 F.2d 871, 876 (1st Cir.1987).

Here, the evidence that employees had been found by General Motors' personnel on the catwalks on more than one occasion in the summer of 1984 and the evidence that the catwalks had been used as short-cuts when Farren worked at the plant in 1981, creates an issue of fact as to whether plaintiff's injury was foreseeable. The Court therefore concludes that the question of foreseeability is properly an issue for the jury to decide, and recommends that summary judgment should not be granted

for ASI on this ground. *See id.* ("[n]ot only fact questions, but also 'evaluative applications of legal standards [such as the legal concept of 'foreseeability'] to the facts' are properly jury questions").

## B. Indemnity Claim against ASI

As a second ground for summary judgment, ASI claims that the indemnity clause of its contract with General Motors does not require it to indemnify General Motors under the circumstances of this case since the accident did not arise out of any work performed by ASI. ASI points to the language contained in paragraph 30 of the Contract General Conditions, providing that the contractor shall indemnify the owner for losses resulting from damages or injuries "caused by or arising out of any action, omission or operation under the Contract or in connection with the work attributable to the Contractor." General Motors opposes summary judgment on the ground that the parties intended for ASI to assume the contractual duty to hold General Motors harmless for *all* claims arising out of ASI's operations at the plant, including the use of labor at the site.

As a threshold matter, both parties rely on Massachusetts law as governing the resolution of this issue. The Court will assume without deciding that Massachusetts law governs here.[6]

Under the modern trend in Massachusetts law, express contracts of indemnity are to be fairly and reasonably construed to ascertain the intention of the parties. *Whittle v. Pagani Brothers Construction Co.*, 383 Mass. 796, 422 N.E.2d 779, 781 (1981). An indemnity provision is no longer to be read with any bias in favor of the indemnitor and against the indemnitee, but rather is to be interpreted like any ordinary contract, with attention to language, background and purpose. *Speers v. H.P. Hood, Inc.*, 22 Mass.App. 598, 495 N.E.2d 880, 881

---

6. The existence of a contractual right to indemnity, and the rights created thereby, are to be determined under choice-of-law rules governing contract claims, see *Restatement (Second) of Conflict of Laws* § 173, Comment b; §§ 187–188

(1971). There are insufficient facts in the record for the Court to determine where the contractual relationship between the parties was centered. *Cf. Schulhof v. Northeast Cellulose, Inc.*, 545 F.Supp. at 1208.

(1986); *see also Shea v. Bay State Gas Co.*, 383 Mass. 218, 418 N.E.2d 597, 602 (1981).

The Court could find no analogous case in Massachusetts construing the language such as was contained in paragraph 30 of the contract between ASI and General Motors, covering all losses "arising from … or in connection with work attributable to" ASI. *Contrast National Pneumatic Co. v. Industrial Cafeterias, Inc.*, 347 Mass. 61, 196 N.E.2d 321, 323 (1964) (finding that the slip-and-fall injury of an employee of defendant from a puddle of water that had gathered as a result of a leak in a sprinkling system which was in plaintiff's control did not arise "out of or in connection with the service of drink and refreshments" within the meaning of the indemnity contract between defendant as indemnitor and plaintiff as indemnitee). Courts in other jurisdictions, however, have addressed the issue whether the "arising from … in connection with" language such as was involved here extends to cover accidents on the work site where the indemnitor's employee was not actually involved in his work when the accident occurred.

In one case, the court applying Texas law strictly construed the contract language and held that a subcontractor's indemnity obligation to its employer did not extend to cover the injury suffered by the subcontractor's employee on the work site while he was off-duty and had gone to an area where he was not permitted to go to find some fishing gear. *See Greer v. Services, Equipment & Engineering, Inc.*, 593 F.Supp. 1075, 1079 (E.D.Tex.1984). *Cf. Smith v. Tenneco Oil Co.*, 803 F.2d 1386, 1388–89 (5th Cir.1986) (indemnity provision in charter agreement between Tenneco as indemnitee and the owner of a vessel chartered by Tenneco as indemnitor, which applied to claims "directly or indirectly connected with the possession, management, navigation, and operation" of the vessel, did not cover injuries that occurred to employee while being lowered to the deck of the boat from Tenneco's oil platform); *Employers Casualty Co. v. Howard P. Foley Co.*, 158 F.2d 363, 365 (5th Cir.1946) (under Texas law, indemnity contract covering injuries occurring "in the course of the performance of [the] contract by sub-contractor" did not extend to cover injuries suffered in a gas explosion by several of the subcontractor's employees when they were in a dressing room provided by the contractor before going to their work site).

Other courts, however, have broadly construed the words "in connection with" and have held that "where the presence of the person at the scene of the injury is attributable to or might reasonably be anticipated by his employment responsibility, then his injuries occur 'in connection with' those responsibilities" and "[i]t is irrelevant that the person is not at that moment performing services or that the injury results from an activity not encompassed by the employer's contractual undertakings." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214–15 (5th Cir.1986) (under federal maritime law, indemnity contract, between owner of drilling rig as indemnitee and company performing drilling operations as indemnitor, extended to cover injuries incurred by a subcontractor's employee when he slipped and fell after disembarking onto the drilling rig en route to his assigned job duties); *see also Turner Construction Co. v. Belmont Iron Works*, 158 F.Supp. 309, 310–11 (E.D.Pa.1957) (under New York law, subcontractor's agreement to indemnify general contractor against liability for injuries "growing out of or resulting from the execution of the work provided for in this Contract *or occurring in connection therewith*" included an injury incurred by an employee of the indemnitor in the act of leaving the premises at the end of the day's work) (emphasis added). *Cf. Gibbons v. Graves Construction Co.*, 727 F.2d 753, 756 (8th Cir.1984) (and cases cited therein) (broadly construing "in connection with" language to cover injuries sustained by railroad employee in connection with the performance of the contract and in connection with the presence of the subcontractor on the railroad's premises).

In an analogous case, the highest New York state court ruled as a matter of law that a subcontractor's agreement to indemnify the general contractor for injuries

"arising out of the work which is the subject of this contract" included injuries sustained by the subcontractor's employee while leaving his workplace for lunch when he was struck by an elevator that was the responsibility of another subcontractor. *O'Connor v. Serge Elevator Co.*, 58 N.Y. 2d 655, 444 N.E.2d 982, 983, 458 N.Y.S.2d 518, 519 (N.Y.1982), *rev'g*, 85 A.D.2d 515, 444 N.Y.S.2d 627 (N.Y.App.Div.1981).[7] The Court reasoned: "The contract could not be performed, of course, unless [the subcontractor's] employees could reach and leave their work places on the job site." *Id.*, 444 N.E.2d at 983, 458 N.Y.S.2d at 519.

This Court finds the reasoning in the *O'Connor* case persuasive and concludes that the language "in connection with the work attributable to the Contractor" contained in paragraph 30 of the contract between ASI and General Motors was intended by the parties to cover injuries sustained by an employee of ASI returning to his work site from a lunch break. This is particularly true in light of ASI's contention that General Motors permitted employees to leave the work site for lunch.

However, the inquiry does not end here. The indemnity provision contained in paragraph 30 expressly provided that ASI was not required to indemnify General Motors for any damages or injuries "caused solely and exclusively by the negligence of" General Motors or its employees, agents, servants and representatives. Therefore, if there were no evidence in the record that ASI's conduct was a contributing cause of Farren's accident, a strong argument could be made that ASI is under no obligation to indemnify General Motors for the injuries incurred by Farren in an area of the plant where work by Giffin and Prime Steel was going on. *Contrast O'Connor v. Serge Elevator Co.*, 444 N.Y.S.2d at 629 (where the indemnification contract provided that the subcontractor's indemnification was required even for damages caused solely by the contractor or his employees).

However, here, General Motors has presented evidence that prior to the accident ASI was instructed to keep its employees from walking around the plant and that Farren had not been informed that he was to remain in his work area while at the plant. *See* pg. 441, *supra*. This evidence is sufficient to create an issue of fact as to whether any negligence on the part of ASI contributed to Farren's accident.

At oral argument, ASI stressed that General Motors is estopped from raising this argument because it routinely allowed employees to go to a break area which was technically off the work site. (Docket 84S, Ex. D, pg. 149). General Motors points out that the canteen facility was adjacent to the work site. (Docket 104, ¶ 5). That evidence, while relevant, only raises a disputed issue of fact as to estoppel. *Cf. Louis M. Herman Co. v. Gallagher Electrical Co.*, 334 Mass. 652, 138 N.E.2d 120, 123 (1956) (in case where plaintiff argued that defendant was estopped from denying the existence of a sales contract, the Court stated "[w]hether there was an estoppel, where it is possible to draw more than one inference from the evidence, was a question of fact").

Accordingly, the Court concludes that the indemnification claim against ASI should not be dismissed at this summary judgment stage in the proceedings.

## CONCLUSION

The Court RECOMMENDS that ASI's motion for summary judgment be DENIED with respect to ASI's claim that the undisputed facts show General Motors was not negligent or liable to plaintiff, and with respect to ASI's claim that as a matter of law it is not contractually required to indemnify General Motors for plaintiff's injury.

However, General Motors having no opposition, the Court RECOMMENDS that partial summary judgment be issued that ASI is only liable to indemnify General Motors for fifty percent of General Motors'

---

**7.** The Court in a later decision in the same case allowed a motion to amend its order against the subcontractor only with respect to remittitur.

*See* 58 N.Y.2d 799, 445 N.E.2d 649, 459 N.Y.S.2d 266 (N.Y.1983).

*pro rata* share of the entire liability, if any, to plaintiff. (*See also* Docket 93, pg. 10).[8]

---

**8.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation and must identify the portion of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *United States v. Valencia-Copete,* 792 F.2d 4, 6 (1st Cir.1986).