No. 2--96--0862

_________________________________________________________________

_______________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

_______________

JANET SEITZ, Indiv. and as ) Appeal from the Circuit Court

Mother and Next Friend of ) of Lake County.

Ashley Seitz and Rachel Seitz, )

Minors, ) No. 95--L--621

)

Plaintiff-Appellant, )

)

v. )

)

JOSEPH VOGLER, as Adm'r of the )

Estate of Eugene Seitz, Deceased, ) Honorable

) Christopher C. Starck,

Defendant-Appellee. ) Judge, Presiding.

_________________________________________________________________

_______________

JUSTICE DOYLE delivered the opinion of the court:

This negligence action arose from a fatal boating accident  involving the collision of two boats on Fox Lake at around 11:10 p.m. on June 15, 1991.  Defendant's decedent, Eugene Seitz (hereinafter defendant), was operating one of the boats (defendant's boat) and was killed in the accident.  Defendant's spouse, plaintiff, Janet Seitz, and the couple's two minor daughters, Ashley Seitz (Ashley) and Rachel Seitz (Rachel), were passengers in defendant's boat at the time of the collision.

Plaintiff, individually, and as mother and next friend of Ashley and Rachel (collectively plaintiffs) brought this action against defendant's estate.  Plaintiff's complaint alleged that, as a result of defendant's negligence, each of the plaintiffs was placed in a zone of danger at the time of the accident and suffered physical injuries as well as psychological and emotional injuries from the collision.

Following a trial in the circuit court of Lake County, a jury returned verdicts in favor of defendant and against each of the plaintiffs.  Plaintiff appeals from a subsequent trial court order which denied her post trial motion seeking judgment notwithstanding the verdict or a new trial.  The issues presented on appeal are (1) whether plaintiff's complaint failed to state a cause of action; (2) whether the jury's verdict was against the manifest weight of the evidence; (3) whether the jury was improperly instructed or an improper 
ex parte
 communication related to a special interrogatory occurred; and (4) whether the trial court erred in granting a motion 
in limine
 in favor of defendant.

At trial, plaintiff's first witness was John Southern.  Southern testified that he and five friends were in the boat that collided with defendant's boat.  One of Southern's friends, Randy Burnett, was operating the boat (the Burnett boat) at the time of the accident.  The group had been using the Burnett boat since about 3:30 p.m. on the day of the accident for various boating activities such as water skiing and tubing.  Southern testified that, during the course of the day, three members of the group, Southern, Burnett, and Brian Koerner, operated the Burnett boat at various times.

Southern further testified that at around 9 p.m., after going into town and getting something to eat, the group got back into the Burnett boat and decided to go for one last ride.  After about an hour and one-half, the group decided to return the Burnett boat to its marina.  Burnett was operating the boat as it headed south and then began heading west to return to the marina.  Southern was sitting in the front passenger seat next to Burnett.  Two other members of the group were in a rear seat and two others were in the cuddy cabin of the 23-foot boat.

Southern testified that Burnett was operating the boat at a "moderate speed" of about five miles per hour.  He stated that the Burnett boat was not creating a wake.  Both Southern and Burnett were looking forward.  The boat's lights were on as they proceeded.  Southern saw no other boats in front of them.

Southern recalled the impact of the collision with defendant's boat, but stated that he did not see the collision because he was looking at his watch at the moment of impact.  He stated that he first saw defendant's boat only after the Burnett boat turned around following the collision.  He also stated that, in the second or two when he was looking at his watch, the front of Burnett's boat suddenly came up and veered over to the left.

Southern further testified that he never saw any lights on in defendant's boat.  When the Burnett boat had turned around and gone back to defendant's boat, plaintiff was screaming hysterically.  Defendant was sprawled out on the floor of his boat in "very bad" condition.  The two children in defendant's boat were crying.  Plaintiff continued to scream during the short period of time it took to transfer her and the children to Burnett's boat and take them to shore.

On cross-examination, Southern denied that the first time that Burnett operated the boat on the day of the accident was about two minutes before the accident.  Southern reiterated that Burnett had also operated the boat earlier that day, in the afternoon.  Southern admitted that he did not tell the investigating police officer on the night of the accident that Burnett had operated the boat earlier in the day.  Southern also admitted that he "might have" told the investigating officer on the night of the accident that the Burnett boat was going 25 to 30 miles per hour at the time of the collision.  Southern also admitted that he told the investigating officer that he saw defendant's boat before the impact.

On redirect examination, Southern stated that the investigating officer did not ask him whether Burnett had operated the boat earlier in the day.  As to seeing defendant's boat before the impact, Southern stated that he only caught a glimpse of defendant's boat just before the collision.

Plaintiff's next witness was David Sallmann, an expert in forensic engineering and accident reconstruction, including boating accidents.  Sallmann also has experience in boating safety.  Based on a review of the police reports concerning the accident, photographs, and two inspections of defendant's boat, Sallmann formulated opinions regarding the accident.

Sallmann determined that defendant's boat was making a full left turn at the time of impact and that the Burnett boat was traveling in a straight line.  Based on the physical evidence of damage to defendant's boat, Sallmann determined that "impact was approximately coming in at 3:00 position" or a crossing position relative to defendant's boat.  Sallmann opined that Burnett's boat was therefore the privileged boat under the rules of navigation and that defendant's boat was obliged to give way to Burnett's boat, 
i.e.
, defendant had the responsibility to take early and substantial evasive action to avoid the collision.  Sallmann opined that the recommended evasive course of action for defendant's boat in such a situation would have been to alter its course to the right.

Sallmann also analyzed the electrical system on defendant's boat.  He found no evidence of any defect or malfunction in the electrical system.  He noted a police report which indicated that the light switch on defendant's boat was in the "off" position when the boat was inspected approximately one hour after the collision.  Based on the report, Sallmann opined that the lights on defendant's boat were not on at the time of the collision.

Sallmann also analyzed the likely speed of the boats at the time of impact.  Based on only the physical evidence, he could not determine the absolute speed of the boats, but he could determine the relative speed of the boats.  Sallmann opined that defendant's boat was traveling at least two-thirds of the speed of the Burnett boat.

On cross-examination, Sallmann acknowledged that he was aware of plaintiff's statements to police officers, first immediately after the accident and, second, while accompanied by her attorney 11 days after the accident.  Sallmann also acknowledged that in these statements plaintiff told the police that the lights on defendant's boat, including the red and green navigation lights and a white pole light, were on at the time of the collision.  Sallmann also acknowledged that, in her statements to Officer Barrett 11 days after the accident, plaintiff said that, in addition to the boat lights, defendant had been using a flood light to help locate navigational buoys as he was proceeding on the night of the accident.

Sallmann considered plaintiff's statements when he formed his opinions regarding the lights on defendant's boat.  Nonetheless, he concluded that, based on the physical evidence, some things plaintiff said she saw were "just physically not possible" and that plaintiff was therefore mistaken.  Sallmann admitted that he did not have any first-hand knowledge as to whether the lights on defendant's boat were on at the time of the collision.

Sallmann also acknowledged that plaintiff, in her statements to the police, said that she did not see any lights from the Burnett boat.  He also was aware that Burnett testified in a  deposition that the boat he was operating was traveling approximately 30 miles per hour at the time of the collision.

Sallmann opined that the physical evidence showed that Southern was mistaken when he testified that the Burnett boat was traveling only five miles per hour.  Sallmann agreed that a speed of 25 miles per hour, or more, for the Burnett boat, was consistent with the physical damage to defendant's boat.

Sallmann was aware that plaintiff said that defendant's boat was traveling very slowly and that defendant was operating the boat very cautiously at the time of the collision.  Nonetheless, Sallmann opined that, based on the physical evidence, defendant's boat "had to be going considerably faster than that" right at impact.

Sallmann acknowledged that he did not physically examine the toggle light switch on defendant's boat.  Rather, because the police had removed the switch, he only examined photographs of the switch.  Based on a picture of defendant's boat which showed how the boat looked after the collision, Sallmann agreed that the entire dashboard of the boat, which presumably included the light switch, could be described as "torn out."  Sallmann further acknowledged that Officer Barrett, who reconstructed the accident for the police department, went to the scene and physically reviewed the damage to the boats and looked at the toggle light switch.  Sallmann was aware that Officer Barrett concluded that the impact of the collision may have caused the switch to go into the "off" position.

Sallmann reiterated that he concluded that defendant's boat tried to avoid the collision by making an evasive maneuver to the left and that the Burnett boat did not make any evasive maneuver.  Sallmann was aware of Burnett's statement in his deposition that he never saw defendant's boat before the impact.  Sallmann agreed that, if the lights were on in defendant's boat, as plaintiff stated, Burnett and Southern should have been able to see the lights for a distance of over one mile.

On redirect examination, plaintiff's attorney showed Sallmann an excerpt from plaintiff's statement to a police officer regarding the lights on the Burnett boat.  The statement indicated that plaintiff saw the Burnett boat only briefly before the collision and did not know if it had any lights on.  Sallmann also agreed that the police report showed that none of the witnesses on Burnett's boat indicated that there were lights on in defendant's boat.  

On re-cross-examination, Sallmann acknowledged that two of the passengers in Burnett's boat were in the cabin at the time of the collision and therefore had no opportunity to observe defendant's boat before the collision.  He also acknowledged that Southern testified that he was looking at his watch at the moment of impact and that the police reports showed that two other passengers were kissing on the rear bench seat of the Burnett boat just before the collision.  

Plaintiff's next witness was plaintiff's brother, Donald Jordan.  Jordan testified that prior to the accident plaintiff was upbeat, energetic, outgoing, active, reliable, and happy.  Before the accident, plaintiff also had no problems with concentration, regularly held a job as a bookkeeper, and was a conscientious housekeeper.  Jordan testified that after the accident plaintiff no longer exhibited these attributes.  Since the accident, she has become a poor housekeeper and withdrawn, and she is unable to concentrate or hold a job.  If Jordan tries to converse with plaintiff, she either drifts away or starts to cry.  Plaintiff has had her phone removed.  She is unreliable and routinely does not appear at events even though she says she will be there.  Jordan characterized plaintiff as "depressed."

On cross-examination, Jordan acknowledged that plaintiff has engaged in certain activities since the accident.  These activities included providing primary care for Ashley and Rachel; being a leader of a brownie troop; selling two automobiles; and taking at least one trip to Florida.

Plaintiff's next witness was Mary Anderson.  Anderson lives about ½ mile from plaintiff and has known plaintiff for about three years.  They are coleaders of a brownie troop.  Although they are coleaders, Anderson does most of the organizational work because plaintiff does not follow through on organizational tasks. 

Anderson sees plaintiff three or four times per week.  Anderson is unable to hold conversations with plaintiff for any length of time.  Anderson testified that plaintiff frequently cries because of "everything going around in her head."  Plaintiff does not elaborate or go into detail on these things.

On cross-examination, Anderson stated that she has two daughters who are close in age to Ashley and Rachel.  Plaintiff watches Anderson's daughters for a few hours three days a week while Anderson works.  Anderson acknowledged that plaintiff has stated that her father died in 1990, her husband died in 1991, her mother died in 1992, and a brother is currently ill.

Plaintiff testified on her own behalf as follows.  She was essentially steadily employed at various jobs from 1979 through 1988 when she gave birth to her youngest child, Rachel.  She also worked in 1990 and 1991 prior to the accident.  Since the accident, she has attempted to return to work twice but stopped working each time after a brief period.  She believes she is unable to work because she "can't concentrate" and her mind wanders.  She did not have these problems before the accident.

When asked if she remembered the accident, plaintiff replied, "A little."  She stated that she remembered seeing the white bottom of the other boat and seeing her husband and her children.  She also stated that she did not remember much with respect to talking to the police officers about the accident.  

On cross-examination, defendant's attorney requested permission to go outside the scope of the direct examination in order to avoid having to call plaintiff back to testify again.  Plaintiff's attorney stated that he had no objection to this.

Plaintiff then testified as follows.  She recalled speaking to police officer Tom Gardner after the accident.  She recalled telling Gardner that the lights on defendant's boat were lit on the night of the accident.  She stated that is what she continues to believe.

Plaintiff also recalled speaking to police officer Roger Barrett while with her attorney about 11 days after the accident.  She told Officer Barrett that the lights on defendant's boat were lit prior to the collision.  The lights that were lit on defendant's boat included the red and green running lights in the front of the boat and a white pole light in the back.  In addition, defendant was using a flood light to help locate buoys in the water.  This was all just before the impact occurred.

Plaintiff also recalled telling Officer Barrett that she did not know whether the Burnett boat had its lights on.  She only saw the Burnett boat briefly.

At the time of the collision, plaintiff was seated in the front passenger seat and Ashley and Rachel were asleep in the back of the boat.  Plaintiff was next to defendant who was operating the boat.  Plaintiff told Officer Barrett that defendant was operating the boat very slowly and cautiously and that the boat was not creating a wake.  

Plaintiff at first answered yes when asked if she recalled telling Officer Barrett that she saw the Burnett boat coming from the left before the collision.  Later, plaintiff stated that she could not recall telling Officer Barrett that.  At the time of the collision, she was seated on the left side of defendant's boat.  Prior to the collision, defendant turned the boat to the left and Burnett's boat collided with the right side of defendant's boat.  

Plaintiff testified that she cut her knees in the accident.  She did not sustain any other physical injuries.  

Plaintiff also testified that Ashley suffered cuts to the inside of her mouth as a result of the accident.  Rachel was not physically injured at all.

Plaintiff testified that, since going to the emergency room after the accident, none of the plaintiffs has seen a doctor for any medical problems related to the accident.  The total medical bills plaintiffs incurred as a result of physical injuries they suffered in the accident amounted to $108.50.  

On redirect examination, plaintiff testified that her seat in defendant's boat was facing defendant's seat before the collision.  After having her memory refreshed, plaintiff recalled telling Officer Barrett that before the collision the boats were positioned as if the hands of a clock were at 1:30.

The jury next watched the evidence deposition of Cynthia Thomas on videotape.  Thomas is a licensed professional counselor working as a psychotherapist.  Thomas saw plaintiff in this capacity several times following the accident.

Thomas first saw plaintiff on September 27, 1991.  On that date, plaintiff came to see Thomas regarding problems centered around defendant's death in the accident.  Plaintiff also was having problems with defendant's parents.  

In her records, Thomas listed a diagnosis for plaintiff of "major depressive disorder with a single episode."  She did not diagnose post-traumatic stress disorder.

Thomas next saw plaintiff on October 8, 1991.  On that date, plaintiff spoke of defendant's parents wanting her to give up her social life and just stay with her children.  

Thomas next saw plaintiff on November 5, 1991.  On that date, plaintiff was tearful and spoke of her "shadow side."  Thomas took this to mean plaintiff's depressive, suicidal, and angry side.  Plaintiff also spoke of nightmares, but none of the nightmares included a boat.  Thomas asked plaintiff to go home and try to draw a picture of her grief.  

Plaintiff stopped coming to see Thomas after that.  Thomas believed plaintiff needed to keep coming, but plaintiff did not respond to efforts by Thomas to reach plaintiff.

On April 7, 1992, plaintiff again came to see Thomas.  On that date, plaintiff told Thomas that since 1990 her father, her husband, and her mother had died.  Plaintiff reasoned that someone left her every six months and she was fearful of what would happen next.  Plaintiff was also extremely angry at her family for always telling her what to do.

Thomas subsequently again listed a diagnosis for plaintiff of major depressive disorder single episode.  The treatment plan was to continue where they were when the earlier sessions broke off as to individual therapy and to encourage plaintiff to join a group for women who felt unsupported.

Plaintiff attended a few group sessions and never returned to the group.  The group pursued plaintiff, but there was no more contact.

Plaintiff attended a few more individual therapy sessions with Thomas.  The last session was on June 10, 1992, which was the week of the anniversary of defendant's death.  Thomas has not seen plaintiff since then.  She has not changed her diagnosis of plaintiff.

On cross-examination, Thomas stated that she believes that plaintiff's fear had become obsessive and may not have been just a reaction to death but also a reaction to trauma.  The "core" of the trauma could have been the accident, or it could have been something in plaintiff's childhood.

Thomas stated that plaintiff showed symptoms consistent with post-traumatic stress disorder.  Thomas opined that witnessing another person sitting nearby in a boat get hit and killed by another boat in a collision and then land on one of the witness' children could cause horror in the witness commensurate with that resulting in post-traumatic stress disorder.  Thomas also stated that a person who has post-traumatic stress disorder could show the following symptoms:  nightmares of the event; intrusive thoughts; avoidance of thoughts or feelings surrounding the trauma; avoidance of activities or places that arouse recollection of the trauma; difficulty recalling events of the trauma in minute detail and an inability to recall important aspects of the trauma; diminishment of interest in significant activities; feelings of detachment and estrangement; a restrictive range of affect; and difficulty concentrating.

On redirect examination, Thomas agreed that the two formal diagnoses she listed in her records for plaintiff were both for major depressive disorder single episode.  She also agreed that the words "post-traumatic stress disorder" did not appear anywhere in her records regarding plaintiff.

On re-cross-examination, Thomas acknowledged that the fact that post-traumatic stress disorder was not listed in the records regarding plaintiff did not mean she did not have post-traumatic stress disorder.

Plaintiff next called Dr. Leonard D. Elkun.  Elkun is a psychiatrist and has practiced for about 20 years.  Plaintiff's attorney hired Elkun to evaluate plaintiff.

Elkun testified that three appointments were made for plaintiff to see him in his office between May and September 1994.  Plaintiff missed all three appointments.

On September 10, 1994, Elkun and plaintiff's attorney drove to plaintiff's home in Wisconsin, and Elkun saw plaintiff for the first time on that date.  Even before the visit began, Elkun noticed that plaintiff was very upset, anxious, and frightened.  During the visit, plaintiff gave Elkun her history.

Plaintiff's history showed that before the accident plaintiff was living a reasonable and satisfying life despite having marital difficulties.  The history showed that before the accident plaintiff was not anxious or depressed and exhibited no evidence of any psychological symptoms.

Plaintiff then described for Elkun her symptoms following the accident.  Based on these symptoms, Elkun diagnosed plaintiff as suffering from chronic unresolved post-traumatic stress disorder.  Elkun concluded that plaintiff exhibited the following aspects of post-traumatic stress disorder stemming from the accident:  (1) exposure to a life-threatening event which generated intense fear; (2) reexperiencing the event in daydreams, fantasies, and nightmares; (3) a numbing of general response; (4) inability to recall important details of the trauma; (5) inability to experience a full range of feelings regarding the trauma; and (6) a sense of a shortened future.

After seeing plaintiff three times in September and October 1994, Elkun decided he would continue with plaintiff as a treating physician.  However, plaintiff "dropped out of existence" until he saw her again in February 1996.  At that time, he confirmed his original diagnosis and concluded that, in some respects, plaintiff's condition had worsened since he last saw her.

Elkun agreed with Thomas' diagnosis of a depression reaction.  However, Elkun adamantly disagreed with Thomas' view that plaintiff's depression was a reaction to grief.  He stated that was clearly a misdiagnosis.

Elkun opined that some aspects of plaintiff's condition are probably permanent.  He also opined that plaintiff was in need of psychiatric care through visits once or twice a week for "a couple of years."  

Elkun also had visits with Ashley and Rachel.  He concluded that both of them suffered from "some degree of depressive affect," but that they probably did not have a full blown psychiatric syndrome.  Elkun opined that both children could definitely use psychological help for symptoms of stress which originated with the accident.  

After Elkun's testimony, both plaintiff and the defense rested.  Defendant then made a motion for a directed verdict regarding Ashley and Rachel.  The trial court granted the motion as to psychological injuries and stated that it found "no credible evidence of any psychological trauma to these children."  The court denied the motion as to physical injuries.

The case went to the jury on the claims for physical injuries to all the plaintiffs and on plaintiff's claim for psychological injuries.  The jury returned verdicts against all three plaintiffs and in favor of defendant.

On appeal, the first issue presented for review is whether the trial court erred when it denied defendant's motion to dismiss the parts of plaintiff's complaint that claimed psychological injuries as a result of witnessing defendant's death.  In response to plaintiff's complaint, defendant filed a motion to dismiss the complaint pursuant, in relevant part, to section 2--615 of the Code of Civil Procedure (Code) (735 ILCS 5/2--615 (West 1994)).  The motion to dismiss contended that plaintiff's claim failed to state a cause of action.

The trial court denied defendant's motion to dismiss and certified the matter for interlocutory appeal under Supreme Court Rule 308 (155 Ill. 2d R. 308).  Over the objection of defendant, the trial court framed the question to be reviewed, as follows:  

"In a case of first impression, if the Defendant, who is also the estranged husband of the plaintiff, is injured or killed himself in the traumatic incident which gives rise to the Plaintiff's Complaint, may a Plaintiff who is alleged to be a bystander and also a direct victim of the traumatic event include as damages the emotional trauma sustained which was caused in part by her observation of the Defendant's being injured or killed if competent medical/psychiatric opinion establishes a causal relationship."

This court denied defendant's application for leave to appeal.  Defendant subsequently presented a motion 
in limine
 seeking to bar plaintiff from presenting testimony regarding psychological injuries she allegedly incurred as a result of witnessing defendant's death or injuries to her children.  The trial court denied the motion 
in limine
.  The case then proceeded to trial.  

In this appeal, defendant again raises the issue of the propriety of plaintiff's cause of action.  Defendant contends that Illinois does not recognize a cause of action that seeks to recover money damages for alleged psychological and emotional injuries on facts as alleged in plaintiff's complaint.  Defendant argues that plaintiff is seeking recovery for injuries that resulted from defendant negligently killing himself.  In defendant's view, such a cause of action is improper because it is not based on a claim of defendant negligently injuring a third party.  Defendant reasons that Illinois does not recognize a duty to refrain from injuring oneself.  As a defendant may raise at any time the threshold issue of whether the complaint alleges a recognizable cause of action, we will address defendant's contention.  See 
Adcock v. Brakegate, Ltd.
, 164 Ill. 2d 54, 61-62 (1994).

Plaintiff responds that the part of her complaint which sought recovery for psychological damages sounded in simple tort based on defendant's negligence.  Plaintiff asserts that, contrary to defendant's implication, she is not seeking to recover for injuries which resulted from witnessing defendant kill himself, 
per se
.  Rather, plaintiff maintains that her complaint alleged the breach of a duty by defendant to operate his boat in a safe manner and to avoid causing harm to persons sharing the waterway with him.  In plaintiff's view, defendant's negligent operation of his boat resulted in her witnessing both defendant's death and the injury or threat of injury to her children causing psychological injury to her.  Plaintiff argues that she may recover damages for these injuries under Illinois law because she was a bystander in a zone of danger and because she also was a direct victim of defendant's negligence.  

In 
Rickey v. Chicago Transit Authority
, 98 Ill. 2d 546 (1983), our supreme court set out the standard to determine whether a bystander may recover for negligently inflicted emotional distress.  The court stated:

"That standard has been described as the zone-of-physical-danger rule.  Basically, under it a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress.  This rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact.  The bystander, as stated, must show physical injury or illness as a result of the emotional distress caused by the defendant's negligence."  
Rickey
, 98 Ill. 2d at 555.

In 
Corgan v. Muehling
, 143 Ill. 2d 296 (1991), our supreme court determined that the zone-of-danger rule does not apply to direct victims of negligently inflicted emotional distress.  Rather, the essential question in such cases is whether the plaintiff properly alleged negligence, using the traditional negligence factors of duty, breach, injury, and causation.  
Corgan
, 143 Ill. 2d at 306.

The 
Corgan
 court also rejected the physical manifestation of emotional distress requirement in cases involving a direct victim.  
Corgan
, 143 Ill. 2d at 308-12.  Thus, a direct victim can allege a cause of action for negligent infliction of emotional distress even if the complaint does not allege that the plaintiff suffered physical symptoms of emotional distress.  
Corgan
, 143 Ill. 2d at 312.  
Corgan
 has been interpreted to mean that any victim of a defendant's negligence need not allege physical symptoms or injuries to recover damages for emotional distress.  
Pasquale v. Speed Products Engineering
, 166 Ill. 2d 337, 378 (1995) (McMorrow, J., dissenting).

In this case, plaintiff was both a bystander and a direct victim.  Plaintiff was a bystander not only with respect to the death of her husband, but also with respect to the actual injury and threat of injury to her children.  Plaintiff's complaint alleged that defendant's negligence caused plaintiff to be in a zone of danger during the accident "wherein she reasonably feared for her own safety and the safety of her children."  Plaintiff's complaint alleged that by being in the zone of danger plaintiff "sustained psychological and emotional damage of a severe and debilitating nature."  Under the above principles, plaintiff's complaint stated a cause of action for the negligent infliction of emotional distress as a bystander.

In addition, plaintiff was a direct victim.  Plaintiff's complaint alleged that as a direct and proximate result of defendant's negligence she suffered physical injuries as well as psychological and emotional injuries.  We agree with plaintiff that defendant had a duty to operate his boat in a safe manner.  Plaintiff's complaint, which alleged that defendant negligently operated his boat, therefore stated a cause of action for the negligent infliction of emotional distress by defendant to plaintiff as a direct victim.  

We find unpersuasive defendant's argument that a cause of action for negligent infliction of emotional distress will lie only against a defendant who injured a third party.  Rather, a cause of action will lie whenever a direct victim sufficiently alleges duty, breach, injury, and causation, and a bystander sufficiently alleges injury resulting from a defendant's negligence while the bystander was in a zone of danger.  Plaintiff's complaint sufficiently alleged a cause of action for negligent infliction of emotional distress both as a bystander and as a direct victim.

The next issue before us is whether the jury's verdict was against the manifest weight of the evidence.  Plaintiff contends that the jury ignored physical evidence showing that defendant was negligent and instead improperly relied on impeachment testimony as substantive evidence.  The alleged impeachment evidence tended to show that defendant was not negligent.

Defendant responds that the jury's verdict was not against the manifest weight of the evidence because there was sufficient properly introduced evidence to support the jury's verdict.  Defendant argues that the jury could have properly determined, based on the evidence, that (1)  defendant was not negligent; and (2) plaintiff was not entitled to damages for psychological and emotional injuries because plaintiff's psychological problems resulted from grief over the death of her husband rather than from trauma due to witnessing or being in the accident.  Defendant asserts that either of these determinations by the jury would have been a sufficient basis for the verdict.

A jury verdict is against the manifest weight of the evidence only if an opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary, or not based on the evidence.  
Leonardi v. Loyola University
, 168 Ill. 2d 83, 106 (1995).  In this case, plaintiff contends that much of the evidence based on plaintiff's own testimony was improper and therefore should not have been considered by the jury.  Plaintiff argues that the evidence was improper because it was introduced as impeachment during cross-examination rather than as substantive evidence.  

We disagree.  The statements defendant elicited from plaintiff on cross-examination constituted more than impeachment.  Rather, defendant elicited confirmation by plaintiff of her prior admissions.  See 
Mayol v. Summers, Watson & Kimpel
, 223 Ill. App. 3d 794, 807 (1992) (admissions of a party opponent are substantive evidence).

These admissions by plaintiff were contradictory to much of the testimony of plaintiff's expert, Sallmann.  Because the statements were properly admitted substantive evidence, the jury could have determined that they were more credible than Sallmann's testimony.  Based on this evidence, the jury could have concluded that the lights on defendant's boat were on at the time of the accident; that defendant was operating his boat in a cautious manner at a slow "no wake" speed;  and that there was no reliable substantive evidence to clearly establish the relative positions of the boats prior to the collision.  If the jury reached these conclusions, it could also have reasonably concluded that defendant did not proximately cause the accident.

In addition, we agree with defendant that there was evidence that plaintiff's psychological injuries were not caused by trauma related to the accident, but by grief over her husband's death and the deaths of her parents, all within a relatively short period of time.  The jury could have found the testimony of Cynthia Thomas credible and the testimony of Dr. Elkun not credible on this point.  Based on such a finding, the jury could also have concluded that, even if defendant was negligent, his negligence did not cause plaintiff's emotional distress.

For these reasons, we conclude that the jury's verdict was not against the manifest weight of the evidence.  Therefore, plaintiff is not entitled to a new trial on that ground.

The next issue before us is plaintiff's contention that she is entitled to a new trial because the trial court erred in instructing the jury.  The general rule regarding instructions is that a court must instruct the jury on all issues reasonably presented by the evidence.  
Chicago Title & Trust Co. v. Brescia
, 285 Ill. App. 3d 671, 685-86 (1997).  Each party is entitled to have the jury clearly and fairly instructed upon each theory that was supported by evidence; however, it is error to give an instruction not based on evidence.  
Leonardi
, 168 Ill. 2d at 100.  The determination of proper jury instructions lies within the discretion of the trial court, and a reviewing court should not disturb the trial court's determination of instructions unless the trial court clearly abused its discretion in making the determination.  
Rowe v. State Bank
, 247 Ill. App. 3d 686, 690 (1993).  The test used in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles considering the instructions in their entirety.  
Leonardi
, 168 Ill. 2d at 100.

Here, plaintiff contends that the jury received two improper instructions.  Plaintiff also contends that there was an improper 
ex parte
 communication between the trial judge and defendant's attorney regarding a special interrogatory. 

Plaintiff asserts that the first improper instruction tendered to the jury was defendant's instruction No. 1, which stated:

"More than one person may be to blame for causing an injury.  If you decide that the defendant was negligent and that his negligence was a proximate cause of the injury to the plaintiffs, it is not a defense that some third person who is not a party to the suit may also have been to blame.

However, if you decide that the sole proximate cause of injury to the plaintiffs was the conduct of some person other than the defendant, then your verdict should be for the defendant."

Defendant's instruction No. 1 is Illinois Pattern Jury Instruction, No. 12.04 (see Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1994)).  Plaintiff contends that the trial court erred in tendering the second paragraph of this instruction because there was no evidence tending to show that a third person was the sole proximate cause of the accident.

We disagree.  All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction.  
Leonardi
, 168 Ill. 2d at 101.  In this case, there was evidence in the record tending to support the theory that Burnett was the sole proximate cause of the accident.  There was evidence that, at the time of the accident, defendant was operating his boat cautiously with the lights on and at a slow rate of speed.  There was also evidence that defendant was using a flood light to locate navigational buoys as he proceeded.  There was evidence that Burnett was operating his boat at a speed of about 30 miles per hour and that he did not see defendant's boat until just before the collision even though defendant's boat had its lights on.  Based on this evidence, the jury could have reasonably concluded that there was nothing that defendant could have done to avoid the collision and that Burnett was the sole proximate cause of the collision.  For these reasons, we conclude that the trial court did not abuse its discretion when it tendered defendant's instruction No. 1 to the jury with the paragraph concerning sole proximate cause.

Plaintiff next asserts that defendant's instruction No. 15 was erroneous.  Defendant's instruction No. 15 recited statutory language (see Ill. Rev. Stat. 1991, ch. 95½, pars. 314--2, 315--2, 315--8 (now codified, as amended, at 625 ILCS 45/4--2, 5--2, 5--13 (West 1994))) regarding the proper equipment for and operation of boats with respect to lights, reckless operation, and traffic rules.  The instruction then stated:

"If you decide that Randall Burnett,[
sic
] violated any of the statutes on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether he was the sole proximate cause of the subject collision."

Plaintiff contends that defendant's instruction No. 15 was erroneous because there was no substantive evidence establishing that Burnett violated any of the recited statutes.  More specifically, plaintiff asserts that there was no evidence showing that the Burnett boat's lights were off, that Burnett operated the boat in a careless or heedless manner, or that the Burnett boat was in the process of passing defendant's boat.  

Plaintiff also contends that the trial court compounded its error in giving the jury defendant's instruction No. 15 by giving or refusing to give certain other instructions to the jury.  In plaintiff's view, these instructions show the inconsistency and unfairness of the giving of defendant's instruction No. 15.

The giving of defendant's instruction No. 15 and a similar instruction regarding defendant served to place before the jury relevant statutes which governed the behavior of Burnett and defendant in their operation of the boats involved in the accident.  The statutory language regarding Burnett's operation of his boat in a careless or heedless manner was appropriate because the jury could have reasonably concluded that Burnett operated the boat "at a rate of speed greater than will permit him in the exercise of reasonable care to bring the watercraft to a stop within the assured clear distance ahead."  This was not so with defendant's operation of his boat.

The statutory language concerning traffic rules for crossing and passing boats was appropriate because the relative positions of the boats before the accident was unclear.  Therefore, depending on its decision as to the position of the boats, the jury could use these statutes to guide it in allocating the negligence of Burnett and defendant.

We agree with plaintiff that the statutory language concerning proper boat lights was inappropriate in defendant's instruction No. 15 because there was no evidence showing that the lights on the Burnett boat were not on at the time of the accident.  However, we consider any error related to this language in defendant's instruction No. 15 to be harmless.

For these reasons, we conclude that the trial court did not abuse its discretion when it gave the jury defendant's instruction No. 15.  

Nonpublishable material under Supreme Court Rule 23 omitted.

Plaintiff next contends that she is entitled to a new trial because the trial court erred in granting defendant's motion 
in limine
 to bar the introduction of evidence regarding the defendant's consumption of a controlled substance.  We note that the motion 
in limine
 also barred the introduction of evidence concerning defendant's consumption of alcohol.  However, in her appellate brief, plaintiff states that a toxicology report showed that defendant had a blood-alcohol level of 0.08.  Plaintiff concedes that such a blood-alcohol level was not presumptive of intoxication at the time of the accident.  Therefore, we will not independently address the trial court decision to bar evidence of defendant's alcohol consumption.

With respect to the controlled substance, a toxicology report showed that, on the night of the accident, defendant had a level of cocaine in his blood and urine of 275 ng/ml.  Plaintiff asserts that the trial court erred when it granted defendant's motion 
in limine
 to bar this evidence because the presence of any amount of a controlled substance such as cocaine in defendant's blood and urine was relevant and admissible.  Plaintiff did not offer any evidence to show that defendant was actually intoxicated or under the influence of drugs. 

In support of her position, plaintiff cites 
People v. Gassman
, 251 Ill. App. 3d 681 (1993).  In 
Gassman
, this court determined that a penal statute prohibiting the driving of a motor vehicle by a person while there was any amount of derivatives from cannabis or a controlled substance in such person's blood or urine was an absolute liability statute. 

Plaintiff asserts that the trial court should have similarly construed the statute governing the operation of a boat under the influence of drugs.  That statute, section 5--16(A)(1)(e) of the Boat Registration and Safety Act (Act) states:

"A person shall not operate any watercraft within this State while:

* * *

(e) There is any amount of a drug, substance, or compound in the person's blood or urine resulting from the unlawful use or consumption of cannabis as defined in the Cannabis Control Act or a controlled substance listed in the Illinois Controlled Substances Act."  625 ILCS 45/5--16(A)(1)(e) (West 1994).

Plaintiff argues that, if section 5--16(A)(1)(e) is construed as the court construed the analogous motor vehicle statute in 
Gassman
, then it was error to bar the admission of the evidence of the presence of drug derivatives in defendant's blood and urine as shown by the toxicology report. 

Defendant responds that the trial court properly barred the evidence because plaintiff did not offer any evidence to prove that defendant was actually intoxicated at the time of the accident.  Defendant argues that evidence of the consumption of a drug will not be admitted in a personal injury case unless it is accompanied by evidence of actual intoxication.

We conclude that it is unnecessary for us to reach the merits of this issue because section 5--16(A)(1)(e) of the Act did not become effective until January 1, 1994.  Pub. Act 88--175, eff. January 1, 1994 (amending 625 ILCS 45/5--16 (West 1992)).  This was well after the accident which occurred on June 15, 1991.  Defendant could not have been found to have violated a statute which was not in force until 2½ years after the accident.

For these reasons, we conclude that the trial court did not err when it granted defendant's motion 
in limine
 to bar evidence of defendant's consumption of a controlled substance as indicated by the toxicology report.  Accordingly, plaintiff is not entitled to a new trial on that issue.

Based on the foregoing, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and BOWMAN, JJ., concur.