In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1483

MICHAEL LEWIS and TAMMY LIVINGSTON,

*Plaintiffs-Appellants,*

*v.*

CITGO PETROLEUM CORPORATION,[1]

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CV 4314—**Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 5, 2008—DECIDED APRIL 6, 2009

---

[1] Pursuant to briefs submitted by the parties on a separate jurisdictional question identified by the court, we grant the uncontested motion of plaintiffs-appellants to strike as parties PDV America, Inc. and CITGO Lemont Refinery, both of which were listed as defendants in the court below. PDV America, Inc. was never served in the lower court, and CITGO Lemont Refinery is not a legal entity and therefore incapable of being sued. This leaves CITGO Petroleum Corp. as the sole remaining defendant-appellee.

Before RIPPLE, KANNE, and TINDER, *Circuit Judges*.

KANNE, *Circuit Judge*. Plaintiffs-appellants Michael Lewis and Tammy Livingston claim to have been injured when they were exposed to hydrogen sulfide gas while working at a refinery operated by the defendant, CITGO Petroleum Corp. They sued CITGO under theories of negligence, which required them to prove that the exposure caused compensable injuries. On the defendant's motion for summary judgment, the district court found expert testimony offered by the plaintiffs on the element of causation to be inadmissible. Absent admissible proof of causation, the district court then granted summary judgment in favor of CITGO. For the reasons that follow, we affirm.

## I. BACKGROUND

On March 11, 2001, Lewis and Livingston allegedly were exposed to hydrogen sulfide gas while fixing a flange at a refinery in Lemont, Illinois. Lewis and Livingston were employed by Philip Services Corporation, which had contracted with CITGO, the refinery's operator, to perform maintenance work at the facility.

On-site emergency personnel and a first-response medical team examined Lewis and Livingston before an ambulance took them to a local hospital. There, the emergency room staff conducted a full medical evaluation, including blood tests and chest x-rays. The hospital released both patients without an overnight stay.

Both Lewis and Livingston returned to work the next day. They received follow-up care from Dr. Bess Metrou, a

physician for MedWorks, a healthcare provider for the refinery. Metrou met with Lewis and Livingston on three occasions in the ten days immediately following the accident. For the next two-and-a-half years, neither Lewis nor Livingston, both of whom are long-time smokers, sought further treatment for any medical problems purportedly related to the gas exposure.

In March 2003, the plaintiffs filed their initial suit against CITGO in Illinois state court. To prepare for trial, plaintiffs' counsel retained two physicians, Dr. Jordan Fink and Dr. Norman Kohn, to evaluate their clients' medical conditions. CITGO countered the diagnoses of doctors Fink and Kohn with a panel of its own experts, including Dr. Terrence Moisan, Dr. David Cugell, and Dr. Jerry Sweet. Although Lewis and Livingston voluntarily dismissed that suit in April 2006, the medical opinions of Fink and Kohn formed the basis of their subsequent 2006 action against CITGO, which is the subject of this appeal.

On August 7, 2003, Dr. Fink, a doctor of internal medicine who specializes in allergies, examined both Lewis and Livingston at the request of their attorney. Fink found Lewis to be in generally good health, but he diagnosed him with "occupational asthma related to exposure to chemicals at work during [the March 11] maintenance accident." Following his examination of Livingston, Fink stated that Livingston's chemical exposure in March 2001 had caused "a bronchitic problem" and possible sinus disease. Fink suggested that both Lewis and Livingston consult with a "neuropsychiatry specialist" to determine whether their purported exposure to

hydrogen sulfide had caused deleterious effects to their nervous systems.

Pursuant to Dr. Fink's advice, several months later, on November 3, 2003, plaintiffs' counsel sent Lewis and Livingston to see Dr. Kohn, a psychiatrist and board-certified neurologist. In Lewis, Kohn found no evidence of "permanent organic brain injury." He noted that Lewis had recurrent headaches, with the "most likely causes [being] direct and indirect sequelae of the workplace incident of March 2001." In Kohn's report on Livingston, he found that she had suffered persistent headaches since the accident but that she, like Lewis, suffered from no permanent organic brain injury. The doctor diagnosed Livingston with potential emotional distress, stating: "While she minimizes her experience now, she very likely suffered posttraumatic stress disorder [(PTSD)] in the earlier phases." He found this problem exacerbated by "an underlying mood disorder, most likely Bipolar Type II."

On June 22, 2006, two months after dismissing their first suit, nearly three years after doctors Fink and Kohn first examined them, and more than five years after the incident at the Lemont refinery, Lewis and Livingston filed a second action against CITGO in the Circuit Court of Cook County, Illinois. In their complaint, Lewis and Livingston sought both compensatory and punitive damages arising from their exposure to hydrogen sulfide gas, which they claimed was due to CITGO's negligence. Relying on diversity of citizenship, CITGO promptly removed the case to federal court.

In an order dated January 30, 2008, the district court granted CITGO's motion for summary judgment. The court noted that it could consider only admissible evidence when ruling on a summary judgment motion. The court then found that the plaintiffs, as the proponents of experts Dr. Fink and Dr. Kohn, had failed to satisfy their burden to demonstrate the reliability and usefulness of the evidence, a prerequisite for admitting expert testimony. The court therefore declined to consider their opinions in making its decision. Without that evidence, the court determined that the plaintiffs had not presented admissible evidence that would create a triable issue of fact on causation, a necessary element of any successful negligence claim. The district court concluded that summary judgment was appropriate, and it is this order that Lewis and Livingston now appeal.

## II. ANALYSIS

We review *de novo* a district court's decision to grant a party's motion for summary judgment. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). If, after reviewing the record as a whole and drawing all reasonable inferences in favor of the nonmoving party, a court determines that there remains no genuine issue as to any material fact, then the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001). Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of

its case. *See Celotex Corp.*, 477 U.S. at 322-23. If there is no triable issue of fact on even one essential element of the nonmoving party's case, summary judgment is appropriate. *Id.* at 323.

As a federal court sitting in diversity, we apply the substantive law of Illinois. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). We construe the plaintiffs' remarkably inarticulate complaint as seeking relief based on two state law theories. The first, which both Lewis and Livingston assert, is simple common law negligence. The second, which pertains to only Livingston, is the separate tort of negligent infliction of emotional distress.[2] As we discuss below, Illinois law treats the two claims similarly in certain situations.

To establish a valid claim for negligence in the state of Illinois, a party must demonstrate that the defendant owed him a duty, that the defendant breached this

---

[2] Only because we are required to construe the evidence in the light most favorable to the nonmoving party, *see Alexander*, 263 F.3d at 680, do we grudgingly recognize a claim for negligent infliction of emotional distress from the face of Livingston's complaint. Nowhere in hundreds of pages of pleadings, filings, and briefings does Livingston state, in so many words, that she seeks recovery under this separate tort. Yet, based on the allegations and facts sprinkled throughout the record, we are able to piece together what appears to be a cognizable claim under such a theory. We note, however, that this construction pushes our obligation in construing the record to its absolute limit; part of that duty is not to build an anthill out of grains of sand scattered across a voluminous record.

duty, and that he suffered an injury that was proximately caused by the defendant's breach. *Cunis v. Brennan*, 308 N.E.2d 617, 618 (Ill. 1974). In the personal injury context, standard negligence claims involve physical injuries and those mental harms, commonly called pain and suffering, that "stem[ ] directly from a physical injury or condition." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544 (1994). As stated above, if CITGO can show that Lewis and Livingston have not produced evidence sufficient to create a triable issue of fact on any one of these elements, summary judgment is appropriate. *See Celotex Corp.*, 477 U.S. at 322-23.

Illinois law on negligent infliction of emotional distress is somewhat more complicated. In evaluating these claims, Illinois courts separate "bystanders" from "direct victims." *See Corgan v. Muehling*, 574 N.E.2d 602, 605-06 (Ill. 1991) (recognizing the different tests applicable to bystanders and direct victims); *see also Kapoulas v. Williams Ins. Agency, Inc.*, 11 F.3d 1380, 1382 (7th Cir. 1993). Bystanders must satisfy the "zone-of-physical danger" test, which limits potential recovery to those individuals "'in a zone of physical danger and who, because of the defendant's negligence, [had] reasonable fear for [their] own safety' which caused them emotional distress, and who could demonstrate physical injury or illness resulting from the emotional distress." *Kapoulas*, 11 F.3d at 1382 (alterations in original) (quoting *Rickey v. Chi. Transit Auth.*, 457 N.E.2d 1, 5 (Ill. 1983)).

By contrast, a direct victim of alleged negligent infliction of emotional distress must satisfy the "impact"

rule. *See Corgan*, 574 N.E.2d at 604-06. Under the impact rule, a direct victim may not recover for emotional distress suffered as a result of the defendant's alleged negligence unless the emotional distress "was accompanied by a contemporaneous physical injury to or impact on the plaintiff." *Rickey*, 457 N.E.2d at 2; *see also Corgan*, 574 N.E.2d at 605. Direct victims no longer need to suffer physical manifestations resulting from the emotional distress as a prerequisite to recovery; emotional injuries alone will suffice. *See Corgan*, 574 N.E.2d at 609.

As a result of these parallel analyses, classifying a claimant as either a bystander or a direct victim becomes important in determining whether potential recovery exists. *Kapoulas*, 11 F.3d at 1382. Under Illinois law, a claimant may be *both* a bystander and a direct victim. *See, e.g.*, *id.* at 1384; *Seitz v. Vogler*, 682 N.E.2d 766, 774 (Ill. App. Ct. 1997). It is unclear from Livingston's complaint whether she is making a claim as a bystander, direct victim, or both. A close reading of the record, however, reveals insufficient facts or allegations to support a bystander claim under the aforementioned test.[3] Thus, we consider her allegations to be those of a direct victim.

---

[3] In her complaint, Livingston states that she "suffered emotional trauma emanating from her being in the zone of danger and witnessing Lewis losing consciousness." While this certainly sounds like an attempt to satisfy the zone-of-danger test promulgated in *Rickey*, 457 N.E.2d at 5, it is missing necessary elements of a valid claim, including evidence of fear for Livingston's own safety. *See id.*

Illinois courts treat claims by direct victims of negligent infliction of emotional distress under the same approach used for standard negligence claims. *See Corgan*, 574 N.E.2d at 306; *Hiscott v. Peters*, 754 N.E.2d 839, 849-50 (Ill. App. Ct. 2001). In other words, a party advancing a negligent infliction of emotional distress claim must demonstrate a defendant's duty, as well as a breach that proximately caused the claimant an injury. *See Parks v. Kownacki*, 737 N.E.2d 287, 296-97 (Ill. 2000). The difference under a claim for negligent infliction of emotional distress, of course, is that the alleged injury may be solely emotional, rather than physical. *See Corgan*, 574 N.E.2d at 609; *see also Gottshall*, 512 U.S. at 544 ("The injury we deal with here is mental or emotional harm . . . that is caused by the negligence of another and that is not directly brought about by a physical injury . . . ."). As with the plaintiffs' negligence claims, if CITGO can show that Livingston has not produced evidence sufficient to create a triable issue of fact on any one of the required elements—duty, breach, injury, or causation—summary judgment is appropriate on her claim for negligent infliction of emotional distress. *See Celotex Corp.*, 477 U.S. at 322-23.

The district court granted CITGO's motion for summary judgment based solely on the plaintiffs' inability to demonstrate a triable issue of fact on the necessary element of causation. We limit our initial discussion to causation before turning, in the context of negligent infliction of emotional distress, to a related question: the necessity of a compensable "effect," i.e., whether the purported emotional injuries were sufficiently egregious to survive summary judgment.

*A. Causation Evidence from the Plaintiffs' Expert Witnesses*

The plaintiffs sought to establish causation for all of their claims through the use of expert testimony offered by Dr. Fink and Dr. Kohn. To defeat a summary judgment motion, however, a party may rely only on admissible evidence. *See Schindler*, 474 F.3d at 1010; *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002); *Smith v. City of Chi.*, 242 F.3d 737, 741 (7th Cir. 2001). This rule applies with equal vigor to expert testimony. *See Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 612 (7th Cir. 1993) (noting that expert testimony must be admissible to be considered in a motion for summary judgment); *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 320 (7th Cir. 1996) (affirming summary judgment when the district court declined to consider expert testimony that it found inadmissible). Thus, the first question that we must answer is whether the district court properly excluded the evidence presented by Fink and Kohn.

The appellants' initial challenge is procedural. Lewis and Livingston claim that the district court was required to consider questions pertaining to the admissibility of evidence separately from those related to the summary judgment motion. Specifically, the appellants argue that their experts' testimony remained admissible at the time of the summary judgment motion because CITGO did not first move to have it stricken. They assert that the court's decision to exclude the evidence, which it made concurrently with its order granting summary judgment, was therefore improper. We disagree.

Although it is rarely a dispositive question, we have repeatedly affirmed district courts that have made eviden-

tiary rulings on proposed expert testimony in conjunction with summary judgment orders. *See, e.g.*, *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 868, 871 (7th Cir. 2001); *Rosen*, 78 F.3d at 318, 320; *Porter*, 9 F.3d at 612, 616-17. The factors the district court must consider in determining the admissibility of expert testimony are well established, *see* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-95 (1993), but the law grants the district court great discretion regarding the manner in which it conducts that evaluation, *see Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998). In *Kirstein*, we noted that "[w]e have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration of the admissibility of expert testimony." *Id.* (citing *O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994)).

Given this precedent, it was entirely proper for the district court to determine the admissibility of the plaintiffs' expert testimony at the same time that it decided the defendant's motion for summary judgment. Further, given that the district court may consider the admissibility of expert testimony *sua sponte*, *see O'Connor*, 13 F.3d at 1094, 1107, it is of no import that CITGO objected to the expert testimony only in its motion for summary judgment, as opposed to first filing a separate motion in limine. Having found the appellants' procedural argument unavailing, we now turn to the substance of the district court's decision that the testimony of the plaintiffs' experts was inadmissible.

In cases where the district court based its decision to grant summary judgment on the exclusion of certain

expert testimony, we review *de novo* whether the court employed the correct legal standard in reaching its admissibility decision. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007). Once satisfied that it did, we review only whether the court abused its discretion in its "choice of factors to include within that framework as well as its ultimate conclusions regarding the admissibility of expert testimony." *Id.*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). Expert testimony is admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589-91. The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard. Fed. R. Evid. 702 advisory committee's note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *cf. Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (holding that the proponent of hearsay evidence must prove to the court, by a preponderance of the evidence, that the Rules of Evidence have been satisfied).

Because it is clear from the district court's order that it applied Rule 702 and *Daubert*, we are satisfied that the

court utilized the correct standard in conducting its analysis. Thus, we review the substance of the court's evidentiary decisions only for an abuse of discretion. *See Winters*, 498 F.3d at 742. Upon review, we conclude that the court was well within the bounds of its discretion in deciding not to consider the testimony of Fink and Kohn.

A party challenging the admissibility of expert testimony can take issue with both the qualifications and the methodology of the proposed expert. For a witness to be considered an "expert," Rule 702 requires that person to be qualified as such "by knowledge, skill, experience, training, or education." But it is not enough that the proposed testimony comes from a qualified physician. As we have said: "[Q]ualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *see also Rosen*, 78 F.3d at 318 ("[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). Instead, to be admissible, a medical expert's ultimate opinion must be grounded in the scientific process and may not be merely a subjective belief or unsupported conjecture. *See Daubert*, 509 U.S. at 589-90; *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 608-09 (7th Cir. 2000).

In its motion for summary judgment, CITGO challenged both Dr. Fink's qualifications and his methodology. CITGO argued that Fink was an allergist and had no training or experience in toxicology or epidemiology. CITGO noted that Fink had treated one patient twelve years earlier who had experienced hydrogen sulfide exposure, and, in preparing his diagnosis in this case, he spent only thirty minutes researching a medical database for relevant information about hydrogen sulfide exposure. CITGO also contested Fink's conclusions regarding both general and specific causation. It pointed to several notable gaps within Dr. Fink's cause-and-effect conclusions, which CITGO argued were based on mere speculation and therefore inadmissible.

In lodging complaints against Dr. Kohn, CITGO focused exclusively on Kohn's methodology. Kohn, who did not examine Lewis and Livingston until two-and-a-half years after the incident, conceded that Livingston did not have PTSD at the time of his evaluation, but stated that she "likely met criteria for [PTSD] at some point in the months following the accident." Kohn reached this conclusion based only on information gathered from Livingston herself; he did not examine her prior medical records. Additionally, Kohn diagnosed Livingston with an underlying mood disorder, which he opined was likely Bipolar Type II, yet he failed to support his conclusions related to the interplay of this underlying disorder and Livingston's past bout with PTSD. As to Lewis, Kohn found that the incident "triggered" his headaches. There again, however, he failed to consider and discount other potential causes, including many purported stressors that were occurring in Lewis's work and social lives.

Faced with CITGO's challenges, Lewis and Livingston, who bore the burden of proving the admissibility of their evidence, *see Bourjaily*, 483 U.S. at 175-76, failed to advance any arguments in support of their experts. They did not suggest that Fink was qualified to render an opinion in this case or that Fink and Kohn based their conclusions on anything other than speculation. Instead, they chose to argue solely on the aforementioned procedural ground—that it was improper for CITGO to challenge the admissibility of their experts' testimony in a summary judgment motion—an argument with which we have already dispatched.

Presented with substantive arguments from only one side, the district court was well within its discretion to review the record and agree with CITGO's basic contention that the plaintiffs had failed to meet their burden to establish the admissibility of their evidence. Our review of the record reveals no reason to disturb this conclusion. The district court did not abuse its discretion when it declined to consider the testimony of Dr. Fink and Dr. Kohn in rendering its summary judgment decision.

## B. Causation Evidence from Other Medical Experts

Lewis and Livingston next contend that even if the district court properly ignored their experts' testimony, other material in the record provides the requisite evidence of causation needed to prevent summary judgment. In regard to their negligence claims, Lewis and Livingston point to reports and statements from the MedWorks

doctor, Dr. Metrou, as well as those from two of CITGO's experts, doctors Moisan and Cugell. As for Livingston's claim for negligent infliction of emotional distress, she refers us to evidence from another of CITGO's experts, Dr. Sweet.

Turning first to both plaintiffs' simple negligence claims, we conclude that Metrou, Moisan, and Cugell provide no evidence of causation. In some instances, Lewis and Livingston grossly mischaracterize the content of the cited testimony. Metrou and Cugell, for example, both stated explicitly that hydrogen sulfide was *not* the cause of various respiratory injuries alleged in this case. Lewis and Livingston also point to testimony that arguably would help them prove the *other* elements of negligence at trial; but of course Lewis and Livingston must first survive summary judgment. To do so, they must present evidence of causation, which they still have not done, making summary judgment appropriate on the negligence claims brought by both of them.

Finally, we consider other potential causation evidence relative to Livingston's claim for negligent infliction of emotional distress. Livingston argues that statements made by Dr. Sweet, an expert retained by CITGO to testify concerning Livingston's psychological condition, provided the necessary evidence of causation. In his deposition, Dr. Sweet, a clinical psychologist specializing in neuropsychology, stated that the incident "did cause [Livingston] some anxiety." He found that this anxiety was "relatively mild" and did not interrupt Livingston's daily activities. He noted that she had continued to work,

but "that she may go back and double-check somebody else's having made [her work area] safe." Based on the timing of the events and Livingston's statements, Sweet opined that Livingston's cautiousness was related to the hydrogen sulfide exposure. He concluded by saying the "level of anxiety that she experiences now [probably] is not diagnosable" and did not warrant care or clinical help.

In granting summary judgment, the district court acknowledged Livingston's "mild anxiety" but concluded that Dr. Sweet "did not find [that] Livingston suffered from any psychological disorders as a result of the incident." It appears that the court, by granting summary judgment for lack of causation despite this evidence, required a more substantial injury than the one diagnosed by Dr. Sweet for a claim for negligent infliction of emotional distress to survive. The district court moved beyond the issue of causation and considered the implicit question contained therein: whether the caused injury—here, mild anxiety—was compensable. The district court concluded that it was not, and we agree.

Implicit in causation is the existence of a compensable injury. A cause without an effect is not actionable under any form of negligence law. The Illinois Supreme Court has not addressed directly the magnitude of emotional injuries required for a claimant to recover on a claim for negligent infliction of emotional distress. A review of decisions by the Appellate Court of Illinois, however, makes clear that emotional injuries must surpass a threshold severity to be cognizable. *See Hiscott*, 754 N.E.2d at

850 ("[T]o prevent trivial or fraudulent claims, . . . recovery for negligently inflicted emotional distress should . . . be provided only for 'serious' or 'severe' emotional injury."); *Majca v. Beekil*, 682 N.E.2d 253, 255 (Ill. App. Ct. 1997) (requiring "medically verifiable manifestations of severe emotional distress" to limit false or magnified claims and concluding that plaintiff's reasonable fears were "not severe enough to justify compensation through the courts"); *Robbins v. Kass*, 516 N.E.2d 1023, 1027-28 (Ill. App. Ct. 1987) (concluding that "crying, sleeplessness, increased migraine headaches and upset feelings" were not sufficiently serious forms of emotional injury to merit recovery for claims of negligent infliction of emotional distress); *cf. Buckley v. Jones Truck Lines, Inc.*, 778 F. Supp. 449, 452 (N.D. Ill. 1991) (recognizing that Illinois law requires the plaintiff in a negligent infliction of emotional distress action to demonstrate "severe emotional distress" but declining to find lack of severity as a matter of law).

In *Allen v. Otis Elevator Co.*, 563 N.E.2d 826 (Ill. App. Ct. 1990), plaintiffs alleged emotional injuries suffered as the direct victims of an elevator breakdown in Chicago's John Hancock Building. *Id.* at 828-29. Plaintiffs claimed that as a result of being trapped in a crowded elevator somewhere near the Hancock Building's ninety-fifth floor, they suffered "continued distress, nervousness and sweaty palms when on elevators, . . . fears of heights or crowds, and, although they have taken elevators and airplanes since the incident, they have taken some actions to avoid taking elevators or using airplanes as a means of transportation." *Id.* at 833. A jury ruled in favor

of the plaintiffs at trial, but the state appellate court concluded that the plaintiffs' alleged injuries were not severe enough to merit that conclusion and ordered a judgment notwithstanding the jury's verdict. *Id.* at 834.

As support for imposing a severity threshold, the *Allen* court cited the state's requirement of physical illness or injury prior to recovery for emotional distress. *Id*. at 833 ("[T]he physical illness or injury requirement indicates a desire to permit compensation only in cases involving serious emotional disturbance." (citing *Robbins*, 516 N.E.2d 1023)). Although the Illinois Supreme Court has subsequently disavowed the physical injury requirement, *see Corgan*, 574 N.E.2d at 609; *see also Buckley*, 778 F. Supp. at 452, many post-*Corgan* opinions continue to embrace the threshold requirement of a severe emotional injury, *see Buckley*, 778 F. Supp. at 452; *Hiscott*, 754 N.E.2d at 850; *Majca*, 682 N.E.2d at 255.

Furthermore, we believe other policies underlying a severity threshold remain valid. It would be anomalous, for example, to require severe injury for a claim of *intentional* infliction of emotional distress but not for emotional distress that is caused by mere negligence. *See Allen*, 563 N.E.2d at 834; *Robbins*, 516 N.E.2d at 1027. In addition, the courts must have some mechanism, in situations such as this, to avoid wasting judicial resources on meritless claims.

In *Corgan*, the Illinois Supreme Court stated that it "[had] not lost its faith in the ability of jurors to fairly determine what is, and is not, emotional distress." 574 N.E.2d at 609. Nor have we. We agree that any claims

of even arguable merit must be given to the jury to consider. But we also recognize our continued obligation to avoid wasting the time and resources of our judicial system. *See Celotex Corp.*, 477 U.S. at 327 (noting that summary judgment has become the principal tool "by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources"). When, as here, a claim for negligent infliction of emotional distress so clearly falls below the threshold requirement of a severe emotional injury, we will not hesitate to dismiss it at the summary judgment stage. We conclude that Livingston's injury— mild anxiety that causes her to recheck her work, but that only minimally interferes with her everyday life and for which she has not sought treatment—does not rise to the level of severity required under Illinois law for an emotional injury to be compensable in a claim for negligent infliction of emotional distress.

### III. CONCLUSION

We GRANT the plaintiffs-appellants' motion to strike PDV America, Inc. and CITGO Lemont Refinery as parties to this case. As to all other claims raised by either Lewis or Livingston, we AFFIRM the district court's order granting summary judgment in favor of CITGO.